In the Matter of Zarko **SEKEREZ.**

No. 880S357.

Supreme Court of Indiana.

Jan. 18, 1984.

Mark R. Harris, Merrillville, for respondent.

David B. Hughes, Indianapolis, for The Indiana Supreme Court Disciplinary Com'n.

### DISCIPLINARY ACTION

PER CURIAM.

This disciplinary matter is before us on a seven-count Verified Complaint for Disciplinary Action filed against the Respondent, Zarko Sekerez, by the Indiana Supreme Court Disciplinary Commission. A Hearing Officer, appointed by this Court, has conducted a hearing pursuant to Admission and Discipline Rule 23 and has submitted his findings of fact. The Respondent now petitions for review of these findings. The Respondent also has filed a Motion for Oral Argument, a Petition for a Trial de Novo, and a Petition for Hearing on Constitutional Challenges. Both parties have submitted briefs in support of their respective positions. Respondent's Motion for Oral Argument is now denied.

At the onset of our review of this case, this Court must address the manner in which the Respondent petitions for review and challenges the findings of the Hearing Officer. Admission and Discipline Rule 23, Section 15, defines the procedure for review by this Court of our Hearing Officer's findings. This provision authorizes a petition for review and requires a party who challenges the factual findings to submit with his petition a record of *all* of the evidence relating to the challenged factual issue (our emphasis). Upon examination of the pleadings filed by Respondent, it appears to this Court that the Respondent has chosen not to follow this procedure.

Respondent's "Petition for Trial de Novo" and "Petition for Hearing on Constitutional Challenges" are not in a form recognized under our rules. However, in that the issues raised under such pleadings are in the nature of issues generally presented in a petition for review, they will be so considered.

On the other hand, the record of evidence presented by the Respondent is totally inadequate. Respondent, in support of his petition for review, filed only a transcript of the testimony of his witnesses. In overruling the Disciplinary Commission's objection and request for an order from this Court directing the Respondent to supplement the record to present all evidence on the challenged issues, this Court noted that

"... the findings of the Hearing Officer are a sufficient basis for the imposition of discipline and that it is incumbent on the petitioning party to present a sufficient record to countermand the significance of the Hearing Officer's findings. If the record submitted is insufficient, the petitioning party must stand on it; if the petitioning party attempts to practice obfuscation, he must accept the consequences."

This Court finds that a transcript containing only one party's case in chief does not constitute all of the evidence as required under the above noted rule.

Before reviewing the specific charges, several preliminary issues raised by Respondent's pleadings must be considered. In his Petition for Trial de Novo, Respondent asserts that he did not receive a fair hearing; he contends that:

1) The Hearing Officer was biased and prejudiced against the Respondent;

2) The findings of the Hearing Officer were based on perjured testimony; and

3) The Hearing Officer did not determine whether misconduct was proved by a preponderance of the evidence as required by Admission and Discipline rule 23, Section 14(d).

In support of Respondent's first contention, Respondent sets forth ten alleged grounds. Respondent generally avers that the Hearing Officer took an extended length of time to adopt, in toto, the proposed findings submitted by the Disciplinary Commission; the Respondent asserts that all controverted testimony was found in favor of the Disciplinary Commission and that several of the findings were not supported by the evidence. And the Respondent objects to several rulings during the course of the hearing and the manner in which the hearing was conducted.

 The adoption by the Hearing Officer of one party's proposed findings does not constitute grounds for challenge. The parties have the same opportunity to present evidence and argue the merits of their respective positions; it is not error to be persuaded by one of the parties. *In re Zinman*, (1983) Ind., 450 N.E.2d 1000. Nor does an adverse ruling constitute error. *In re Kesler*, (1979) 272 Ind. 161, 397 N.E.2d 574, cert. denied 449 U.S. 829, 101 S.Ct. 96, 66 L.Ed.2d 34.

 To establish error predicated on the alleged bias and prejudice of a Hearing Officer (or judge), Respondent must demonstrate by a valid and complete record that the alleged bias or prejudice stems from an extra-judicial source and results in an opinion on the merits on some basis other than what was learned through participation in the case. *United States v. Grinnell Corporation*, (1966) 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778; *United States v. English* (7th Cir.), (1974) 501 F.2d 1254, cert. denied; *Hubbard v. U.S.*, 419 U.S. 1114, 95 S.Ct. 791, 42 L.Ed.2d 811. Reviewing that which has been filed in this cause, this Court finds that Respondent has not demonstrated bias and prejudice on the part of the Hearing Officer.

 As a second contention to his Petition for Trial de Novo, Respondent further argues that the Hearing Officer based his findings on allegedly perjured testimony. Though such a challenge goes to the credibility of witnesses and is to be properly resolved in this Court's ultimate review of the facts, in that the Respondent is contending these adverse rulings may have a cumulative or corroborative effect, we would be inclined to consider it at this juncture. However, as with many of Respondent's other contentions, we find that he had failed to present an adequate record from which this Court can make an informed decision.

 As his third contention, Respondent asserts that he is entitled to a new hearing by reason of the Hearing Officer's failure to rule within thirty days as required under our rules. This Court has previously held that the expiration of the thirty day time period under Admission and Discipline Rule 23, Section 14(d), without further showing of impairment, does not establish a constitutional infirmity *In re Zinman*, Supra., *In re Wireman*, (1977) 270 Ind. 344, 367 N.E.2d 1368, cert. denied 436 U.S. 904, 98 S.Ct. 2234, 56 L.Ed.2d 402.

 Respondent argues that the nine month delay in the Hearing Officer's ruling made appeal more difficult and diminished the recall of events. The proceedings were reported and a complete transcript was available. An adequate record at the time of hearing would have preserved any issue the Respondent deemed worthy of review by this Court. There has been no showing that the delay in ruling destroyed the fundamental fairness of the disciplinary process. As this Court noted in its prior order, "if the record submitted is insufficient, the petitioning party must stand on it . . .".

In view of the above considerations, this Court denies the relief sought in Respondent's Petition for Trial de Novo.

 In his Petition for Hearing on Constitutional Challenges, the Respondent contends that the Hearing Officer erroneously ruled that he could not hear Respondent's

challenges and did not give the Respondent an opportunity to present evidence relating to his constitutional challenges. In support of this contention the Respondent has submitted a single page excerpt of the transcript of the hearing, which reads as follows:

MR. SEKEREZ: My constitutional issues, Your Honor.

THE COURT: Okay. I'm trying to figure—I don't know what bearing this would have on that cause.

MR. HUGHES: The record is full of constitutional issues. He's filed a motion to stay, he's filed them in the Federal Court, he's filed them in the State Supreme Court that Your Honor has no jurisdiction to determine any constitutional issue, and he has raised them in his pleadings, in his answer, in his affirmative defense, and I think that any further expounding on those, would be superfluous to the record.

THE COURT: I can't—I think a record has been made of that fact, and I don't see any—I can't make a decision one way or another on that issue.

With that, I'm going to go back again to the point. Mr. Hughes, do you want to make an opening statement at all?

MR. SEKEREZ: Is it my understanding that Your Honor is not going to adjudicate on the issues?

THE COURT: What? The constitutional issues?

MR. SEKEREZ: Yes, sir.

THE COURT: I don't think I have authority to make that kind of a ruling on those issues. I've made a ruling of the fact that I do not have authority to do that.

Predicated on the record submitted, Respondent now argues that he was not afforded due process at the hearing stage and accordingly should be allowed a further hearing to present his evidence and make his constitutional arguments. He has presented no authority defining such due process entitlement.[1] Other than the above cited excerpt, Respondent has demonstrated no offer of excluded evidence at the trial stage nor advanced an argument as to why the presentation of constitutional issues to this Court would be inadequate. This Court cannot suppose a record and argument.

In light of these considerations, Respondent's request for a new hearing is denied. However, as previously noted, the constitutional issues he raises in this pleading will be treated as if properly raised in a Petition for Review.

■ As a final preliminary matter, we note that the Respondent also urges, in a single sentence, that Admission and Discipline Rule 23, Section 14(f), which provides for the "preponderance of evidence" standard of proof for disciplinary cases, is in violation of the Due Process Clause of the Fourteenth Amendment of the Constitution of the United States. The Respondent makes no attempt to substantiate this contention. However, in the recent case of *In re Moore*, (1983) Ind., 453 N.E.2d 971, this Court re-examined the standard of proof applicable to these cases and determined that the "clear and convincing" standard of proof more reasonably conforms to our analysis of the nature of the disciplinary process and follows the weight of authority. Accordingly, we will review the evidence in this case under a "clear and convincing" standard.

■ Turning now to an examination of the charges filed and the evidence of record, we again note that Respondent has chosen not to follow the procedure for challenging the Hearing Officer's findings of fact. As this Court has stated in the past, a hearing officer's findings are treated with due deference, but they are not controlling. *In re Zinman, Supra; In re Callahan*, (1982) Ind., 442 N.E.2d 1092; *In re Crumpacker*, (1978) 269 Ind. 630, 383

---

1. Respondent cites *Middlesex County Ethics Committee v. Garden, Etc.*, (1982) 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116. This case involved the federal court's policy of abstention in state proceedings. It does not define due process entitlements to hearing. Whether or not a federal court would entertain jurisdiction is not an issue before this Court.

N.E.2d 36. Our rules require, however, that "in the event a party does not concur in a factual finding made by the hearing officer ..., such party shall file with the petition for review a record of all the evidence before the hearing officer relating to this factual issue". Admission and Discipline Rule 23, Section 15(c). As previously held, the transcript submitted by the Respondent did not comply with our rule. Therefore, in that the Respondent has not provided the requisite record to assert error and in that the Disciplinary Commission has not submitted any record, this Court now adopts and accepts as its own the findings of fact submitted by the Hearing Officer and will only review the conclusions thereunder and the Respondent's constitutional challenges.

## COUNT I

Under Count I, the Respondent is charged with violating Disciplinary Rules 7–101(A)(1) and 1–102(A)(6) by knowingly failing to appear at a hearing on behalf of a client.

In accordance with the Hearing Officer's findings of fact, we find generally, that the Respondent is a member of the Bar of this State heretofore admitted on May 19, 1965. On or about January 25, 1979, Katherine Carter went to the Respondent's Merrillville Legal Clinic and retained the Respondent to obtain a court order to allow her to remove her minor son to Tennessee. The Respondent quoted Carter a total flat fee of $200 and collected the same at their meeting. Carter informed the Respondent during their conference that she would be moving to Tennessee within a week, and the Respondent advised her that such a move was proper.

Thereafter, the Respondent filed in the Lake County Superior Court a petition to remove the minor child. On February 21, 1979, at Respondent's request, the petition was set for a hearing at 11:00 A.M. on March 27, 1979, as a "secondary setting". The Respondent never attempted nor made any service of the petition or notice of the hearing upon Carter's ex-husband. The Respondent did not advise Carter of the hearing date. However, upon calling Respondent's office, Carter was advised of the hearing and was told by a secretary that the Respondent was unable to appear with her and that the hearing would likely be continued.

Carter called the court on the date of the hearing and was informed that her petition was still set for a hearing that morning and that the primary setting had been continued as of 10:30 A.M. the previous day. After the Court attempted and failed to locate the Respondent, the following entry was made:

"... petitioner's attorney ZARKO SEKEREZ fails to appear even though his office was contacted by phone by the Bailiff of this Court. Neither Atty. Sekerez or any member of his Legal Clinic appeared ..."

The Court also advised Carter that if her ex-husband was not notified of the filing of the petition or the hearing date, the order could be set aside at a later date and Carter would have to appear again for a hearing.

Upon her return to Tennessee, Carter wrote the Respondent requesting the return of the $200 fee. The Respondent wrote back refusing any refund and advising her that had he attended the hearing he would have charged another $250. Eventually, the Respondent returned the $200 fee but not until Carter filed a grievance against him with the Disciplinary Commission.

The Respondent does not challenge these facts. He even concedes that he intentionally did not appear. He contends that the findings are insufficient to constitute a violation in that his decision not to attend a "secondary setting" hearing is simply an exercise of professional judgment and is not intentional failure to seek his client's lawful objectives.

Though there are many times in a proceeding when an attorney has a great deal of latitude in using his professional judgment for strategic purposes, an intentional decision to totally ignore a

scheduled hearing is not one of those discretionary matters. It is the lawyer's paramount duty to monitor his client's case and to check with court records and personnel as to any developments. In this instance the Respondent made absolutely no effort to follow up on the hearing scheduled as a "second setting" but, as he concedes, chose not to appear. The element of intent of this charge may be established by resort to reasonable inferences based on an examination of the surrounding circumstances. *In re Vincent* (1978), 268 Ind. 101, 374 N.E.2d 40. Respondent's intentional failure to act may be presumed from his voluntary acts. *In re Price* (1982) Ind., 429 N.E.2d 961; *In re Vincent, Supra.*

 Respondent's position that Disciplinary Rule 7–101(A)(1) is obviously and clearly unconstitutional is not at all obvious and clear. In that his broad assertion is completely unsubstantiated by any authority, we find it to be meritless. Respondent's constitutional challenges for vagueness of Disciplinary Rule 1–102(A)(6), which proscribes conduct that adversely reflects on an attorney's fitness to practice law, is similarly unsupported by any authority. A disciplinary rule will not be found to be overbroad or vague and, hence, constitutionally infirm, when the subject rule is commonly understood by reasonable men and particularly by attorneys. See *In re Perrello* (1979) 271 Ind. 560, 394 N.E.2d 127. There is no doubt that an intentional and unexcused failure to appear for a scheduled hearing on a client's case not only constitutes a breach of the attorney-client fiduciary relationship, but is understood by lawyers and laymen alike to reflect adversely on the attorney's competence and fitness to represent others.

Respondent's claim that these rules are unconstitutional because they are being applied in a capricious or arbitrary fashion is similarly unsubstantiated by any cogent argument, authority or record and, as such, is meritless.

In light of our considerations and the findings of fact regarding Count I, we find that the Respondent did engage in the misconduct as charged and that such misconduct is violative of Disciplinary Rules 7–101(A)(1) and 1–102(A)(6) of the *Code of Professional Responsibility.*

## COUNT II

On or about February 14, 1979, Mark Ward retained the Respondent to defend him in a suit brought by Sears Department Store in the Gary City Court. Ward paid the Respondent a $50 retainer fee and the Respondent agreed to enter his appearance and to negotiate with the Sears' attorney the remaining balance on the account owed by Ward.

In April of 1979, an agreement was reached whereby the litigation would remain open and Ward would pay Sears, through its attorney, $50 per month. The Respondent never thereafter discussed the case with Ward, though in May, 1979, Ward attempted on several occasions to learn the status of the case from the Respondent. Commencing in July, 1979, and for several months thereafter, Ward was absent from work on sick leave, was hospitalized, and was unable to make any payments to Sears or its attorney.

The Respondent, after being advised by the Sears attorney that Ward had not paid the agreed monthly payments, withdrew his appearance for Ward on August 21, 1979. The Respondent never attempted to notify Ward of his contemplated withdrawal and the Respondent knew that Ward had no knowledge of such intended withdrawal.

Thereafter, Sears reduced its suit to judgment. Ward returned to work on October 15, 1979. He received his first pay check on October 30, 1979, to discover that his wages had been garnished to partially satisfy the Sears judgment. On several occasions Ward requested the return of his file from the Respondent, but the Respondent never complied.

The Respondent contends that he gave notice to the client. We are unpersuaded by his contention in light of our earlier determination as to the incomplete record submitted by the Respondent.

The Respondent further argues that he fulfilled his duty to his client and that any resulting prejudice was not foreseeable but was caused by others, such as the Gary City Court personnel. Such argument is wholly misdirected because it fails to answer the specific charge of failing to take reasonable steps to avoid foreseeable prejudice to the rights of his client. Withdrawing, without giving notice to the client, did not give the client an opportunity to even appear *pro se* since he was unaware that he was no longer represented. The resulting sequence of events, i.e., a judgment and garnishment without the client's knowledge, were fully foreseeable and are the sort of unfortunate consequences which are intended to be prevented through Disciplinary Rules 2–110(A)(2) and 1–102(A)(5). The Respondent's challenge to the former rule is unsubstantiated by any record or authority and, as such, is meritless. As to Disciplinary Rule 1–102(A)(5), the Respondent argues that its application should be restricted to instances involving "obstruction of justice". This Court has repeatedly found conduct which is damaging to the client to be conduct prejudicial to the administration of justice. See *In re Zinman, Supra; In re Gibson* (1983), Ind., 444 N.E.2d 852; *In re Lytal* (1983), Ind., 444 N.E.2d 853; *In re Morris* (1982) Ind., 440 N.E.2d 675. In light of this established and commonly understood interpretation of the rule within this State, we find Respondent's contention unconvincing. Respondent's contention that Disciplinary Rule 1–102(A)(5) is unconstitutionally vague and overbroad is not supported by any authority and is similarly unconvincing.

In accordance with the foregoing considerations and with the findings of fact under Count II, we find that the Respondent engaged in the misconduct as charged and that such misconduct is violative of Disciplinary Rules 2–110(A)(2) and 1–102(A)(5) of the *Code of Professional Responsibility*.

## COUNT III

In Count III of the Verified Complaint, the Respondent is charged with making a false advertisement and misleading a client, aiding a non-lawyer in the unauthorized practice of law and engaging in conduct involving deceit and misrepresentation.

Adopting the Hearing Officer's findings we now find that Susan McCoy responded to an advertisement by the Respondent in the yellow pages of a telephone directory. The advertisement was listed under "Merrillville Legal Clinic" and it advertised "No Charge for Initial Consultations". McCoy made an appointment with the Merrillville Legal Clinic in April of 1979 concerning a dissolution of marriage. Upon her visit, McCoy was directed by a receptionist to fill out certain forms in order to process the divorce. She was further instructed by the receptionist to pay one-half of the attorneys fee of $200. McCoy paid $100, filled out the forms and was told to return in June when she had satisfied her six (6) month Indiana residency requirement. McCoy did not receive an initial consultation with a lawyer, free or otherwise.

On June 5, 1979, McCoy returned to the Clinic, executed her petition for dissolution, and was told by the receptionist that it would be sixty days before a final hearing could be held. McCoy again did not consult with a lawyer. Thereafter, McCoy called on two occasions to seek legal advice. In both instances she was advised by law students. In her first call she asked about the consequences of her husband having hired a lawyer to contest the divorce. She was told by a law student that there would be an increase in the attorney's fee of $20 and, further, that there would be no legal problem associated with the contest since the basis for her petition was on "irretrievable breakdown". McCoy's next call was to inquire about possible legal problems resulting from her intended move to California before the final hearing. A non-lawyer law student advised her that there would be no legal problem if she returned for the hearing. McCoy relied upon this advice and thereafter moved to California.

Following the sixty day "waiting period" McCoy made several telephone calls to the Merrillville Legal Clinic to determine the hearing date for the divorce. She spoke with a secretary and a law student. The latter informed her that she must pay the balance of the fee, $128, which McCoy did. Thereafter, a secretary in the Clinic advised McCoy that the final hearing date was September 14, 1979, at 11:00 A.M. in Crown Point, Indiana.

McCoy returned to Indiana as instructed and appeared in the court at the appointed hour to find that no hearing had ever been set in Crown Point for McCoy's dissolution. At that time and place McCoy first met and spoke with the Respondent. McCoy had never spoken with a Merrillville Legal Clinic attorney concerning the dissolution until this meeting with the Respondent on September 14, 1979. He did not have her file and then discovered that the case had been venued in August to East Chicago on a motion for change of judge filed by opposing counsel. The Respondent attempted to arrange a hearing on that day but was unsuccessful. He informed McCoy that her husband was demanding a cash settlement of approximately $800 including the husband's attorney's fees of $600. The offer had been made to the Respondent in writing by opposing counsel on August 6, 1979, but the Respondent had never communicated this to McCoy. The Respondent also advised McCoy that, contrary to the law student's advice, the Respondent could represent her without her presence. He suggested to McCoy that she agree to pay the opposing counsel's attorney's fees, but return to California and not pay the fee. He further agreed to refund his fee.

■ The Respondent now argues that the evidence is insufficient to support a finding that McCoy was not given a free consultation with a lawyer as advertised because, he contends, the Commission failed to prove that the woman who saw McCoy at the clinic was not a lawyer. This contention is not convincing. McCoy went to the Clinic in response to a specific advertisement for a free initial consultation.

She was only asked questions for the purpose of completing a prepared form. Providing this information to a person who is filling out a form does not constitute a consultation. The fact that other clients may have, as Respondent argues, received the advertised free consultation with a lawyer has no bearing on the fact that McCoy did not.

■ The Respondent also contends that the evidence is insufficient to prove that he aided a non-lawyer in the unauthorized practice of law. We disagree. There is no doubt that law students in the Respondent's legal clinic answered McCoy's telephone inquiries concerning legal matters. The Respondent cannot avoid all responsibility by simply arguing that he did not know how his staff worked. In *In re Price, Supra*, we analogized the scienter element of a disciplinary charge to the definition of "knowingly" as it relates to criminal culpability and found that the Indiana General Assembly has defined "knowingly" as follows:

(b) A person engages in conduct "knowingly" if, when he engages in the conduct, he is aware of a high probability that he is doing so. IC 35–41–2–2(b).

Even though Disciplinary Rule 3–101(A) has no requirement of specific knowledge, the evidence in this case satisfies the above definition. The Respondent was McCoy's attorney and yet, from April of 1979, to September 14, 1979, the date of their first meeting for a mistaken appearance in the wrong court, he had never spoken or met with her. The Respondent's obvious unfamiliarity with the case is evidenced by his lack of knowledge as to the status of the case. It is clear that a pleading had been prepared and filed and McCoy's legal questions had been answered over the telephone. She was made aware on more than one occasion that she was consulting with law students working there. Ethical Consideration 3–6, which Respondent cites as authority for delegation of duties to clerks, secretaries and other lay persons, makes that delegation conditional upon the lawyer maintaining a direct relationship with his

client, supervising the delegated work and retaining complete responsibility for the work product. These conditions were not met in McCoy's case.

We, therefore, conclude that the evidence is more than sufficient to convince us that the Respondent was aware of a high probability that his nonlawyer employees had prepared the McCoy case and had answered her legal questions.

As with the other disciplinary rules under which he is being charged, the Respondent challenges the constitutionality of Disciplinary Rules 2–101(A), 3–101(A) and 1–102(A)(4) in their application to the Respondent under the facts of this count. In that these challenges are mere blanket assertion and are not supported by any authority, we are inclined to find them meritless. We conclude, from the foregoing findings and considerations, that the Respondent engaged in the misconduct as charged under Count III.

### COUNT IV

In Count IV the Respondent is charged with neglecting a legal matter entrusted to him and failing to carry out a contract of employment entered into with a client in violation of Disciplinary Rules 6–101(A)(3) and 7–101(A)(2).

On February 13, 1977, Judy Gibboney retained the Respondent's legal clinic in Indianapolis, Indiana, to handle her divorce. Mr. Gibboney, who accompanied his wife, paid a $50 retainer and $38 filing fee. David Muir, an attorney employed by the Respondent, gave Gibboney a receipt in the name of Respondent's Indianapolis clinic and promised that the divorce petition would be filed within a week.

Muir had been employed by the Respondent only a few weeks. Pursuant to the Respondent's instruction to forward all matters to the Merrillville clinic for processing, Muir forwarded the Gibboney paperwork there on February 13, 1979.

During the next three weeks, the Gibboneys called several times to inquire about their divorce petition. Muir advised them

that the delay was caused by typing problems at the Merrillville Legal Clinic. On March 6, 1979, the Gibboneys called Muir requesting that he not proceed with the case and that he return the retainer and filing fees. Muir informed them that only Respondent can authorize refunds and that they will have to discuss the matter with the Respondent in Merrillville. Mr. Gibboney called the Respondent but the Respondent never returned his calls. Someone at Respondent's Merrillville office offered to refund the $38 filing fee. After Gibboney filed a grievance with the Disciplinary Commission, the Respondent refunded $88.

We have examined the foregoing findings and are inclined to conclude that, although the Respondent's instructions as to the operation of the clinic were indirectly responsible, they are insufficient to prove that the Respondent himself neglected a legal matter or failed to carry out a contract of employment entered into with a client. We, therefore, conclude that a violation of Disciplinary Rules 6–101(A)(3) and 7–101(A)(2) has not been proved.

### COUNT V

The findings under Count V show that on July 19, 1978, Linda Hatcher was involved in a minor automobile accident resulting in $140 damage to her car. On August 8, 1978, James Hatcher, Linda's husband, filed a small claims suit in Lake County to recover said damages. James Hatcher had met the Respondent in September of 1978 when Hatcher had interviewed with the Respondent seeking employment in Respondent's engineering company. Later, having read Respondent's advertisement for "No Charge for Initial Consultations" in the yellow pages of the telephone directory, and on the recommendation of a friend, Hatcher made an appointment with the Respondent through Respondent's Merrillville clinic.

On November 29, 1978, after the Respondent failed to appear for two scheduled appointments, the Hatchers met with a Mrs. Saviola of the Respondent's Merrillville Legal Clinic. They believed that Savi-

ola was a lawyer and showed her all their documents concerning the case. Saviola, who was in fact a secretary at the clinic, examined and retained the documents and recovered a $50 retainer.

Thereafter, the Hatchers received a letter dated November 28, 1978, from the Respondent advising them that he had accepted the case. On December 29, 1978, the Respondent entered his appearance in the Hatcher case which had been scheduled for trial on January 3, 1979. The Respondent failed to appear at the trial and the case was dismissed without prejudice.

On January 19, 1979, the Hatchers received from the Respondent's office a proposed complaint to be filed on their behalf in the Lake Circuit Court relating to the accident and seeking compensatory and punitive damages in excess of $12,500. This cause was filed on February 21, 1979.

During the first three months of 1979, the Hatchers repeatedly called the clinic. They also paid an additional $25 on their account with the Respondent. The Respondent never returned their calls nor answered their letters. The Hatchers were never able to discuss their cases with any other attorney at the clinic.

On March 13, 1979, the Hatchers received, through the Respondent's clinic, a request for production of documents and a set of 62 interrogatories from defendant's counsel in their lawsuit. They tried to schedule an appointment with the Respondent concerning these, but the Respondent failed and refused to see them or return their calls.

On April 30, 1979, the Respondent wrote the Hatchers and told them he was withdrawing from their case. His motion to withdraw was granted by the court on the day set for a hearing on defendant's motion to dismiss the Hatcher case and the Hatchers were granted a 30 day continuance. They requested the return of their file from the Respondent, but he refused. On November 13, 1979, the defendant's motion to dismiss was granted with prejudice.

■ The Respondent challenges many of the foregoing findings contending that there is evidence to the contrary. We must again point out that the Respondent has submitted an incomplete and misleading record containing only those matters most favorable to his position and excluding the testimony of the Commission's witnesses. As in the earlier instances, we must disregard such record. Furthermore, the existence of evidence which the Respondent claims is contrary to the findings, only goes to the weight of the evidence and the credibility of the witnesses. The Hearing Officer has concluded, from what was presented before him, that the foregoing findings are in fact supported by sufficient evidence. We have adopted such findings. Accordingly, we conclude that Respondent's advertisement for a free initial consultation was false and misleading in that the Hatchers never received a consultation with any lawyer at the Respondent's clinic. Such conduct is in violation of Disciplinary Rule 2–101(A).

■ The Respondent also contends that there is no finding to support a conclusion that he refused to return papers to which the Hatchers were entitled. We disagree. The clients requested their file and the Respondent refused to return it, any part of it. It is implicit in this finding that an attorney who has filed a $12,500 complaint for a client has documents and pleadings which are necessary for the continued litigation of the matter and to which such client is entitled. Furthermore, in their initial meeting with Saviola, the Hatchers gave all their documents to her and she retained the same. It is our conclusion that the Respondent did refuse to return the Hatcher file to which the Hatchers were entitled and, thus, withdrew from a case without taking all reasonable steps necessary to avoid foreseeable prejudice to them. Such conduct is violative of Disciplinary Rule 2–110(A)(2).

■ The Respondent contends that the findings are insufficient to support a conclusion that he violated Disciplinary Rule 1–102(A)(5) and (6) by delegating the inter-

viewing of his client to a secretary and by refusing to consult with the clients. We find to the contrary. Respondent undertook to represent these clients, allowed their small claim suit to be dismissed and filed a $12,500 claim without ever discussing their case with them. He forwarded to these laymen a set of discovery papers, again without ever discussing these important matters with them. He never returned their numerous inquiries and letters about their case. An attorney-client relationship should be one based on trust. Under these circumstances, Respondent's treatment of the Hatchers and their case does reflect adversely on his fitness to practice law, is prejudicial to the administration of justice and is violative of Disciplinary Rules 1–102(A)(5) and (6).

Examining the findings in respect to Disciplinary Rule 7–101(A)(2) and (3), we find that they establish Respondent's callous neglect of the Hatcher case. He failed to answer their numerous inquiries and withdrew in violation of Disciplinary Rule 2–110(A)(2). By this conduct, he failed to carry out his contract of employment and thereby violated Disciplinary Rule 7–101(A)(2). Respondent's failure to consult with the Hatchers, his withdrawal and refusal to return their file resulted in a dismissal of their case. Such conduct prejudiced and damaged the Hatchers and is thus violative of Disciplinary Rule 7–101(A)(3).

Once again, the Respondent challenges the constitutionality of the Disciplinary Rules under which he is charged in a broad and conclusory manner. In that his contentions are conclusory and not supported by authority, reliable record or convincing argument, we find them without merit.

## COUNT VI

In Count VI of the complaint the Respondent is charged with improper use of a trade name in connection with the operation of his Legal Clinics in violation of Disciplinary Rule 2–102(B); with advertising such trade name and thus violating Disciplinary Rule 2–101(A); with advertising his clinics in pamphlets constituting professional notices not authorized by Disciplinary Rule 2–102, thus violating Disciplinary Rule 2–102(A).

We find that the Respondent is the sole proprietor of numerous "legal clinics" located in several cities within Indiana. At the time of the final hearing in this cause, he owned such clinics in Merrillville, Indianapolis, Lafayette, Rensselaer, Ft. Wayne, South Bend, Valparaiso, Michigan City, East Chicago and Hammond. All of said clinics are named for the particular city in which they are located, e.g., "Merrillville Legal Clinic", "Indianapolis Legal Clinic", "Lafayette Legal Clinic", etc. The Respondent and his legal clinics engaged in extensive advertising, particularly in local newspapers and the yellow pages of the telephone directories published in the various locales. The Respondent also has advertised his legal clinics through pamphlets made available to visitors in several of his offices. These pamphlets also advertise the clinics, under the name of the particular city.

Some of Respondent's past advertisements in newspapers and via pamphlets contain the name of the clinic but do not disclose Respondent's identity or his association with the clinics. The bulk of Respondent's past and present newspaper advertising contained both, the clinic name and the Respondent's name. However, his name is always smaller, far less bold, and inconspicuous compared to the print which contains the name of the clinics. Respondent's past and present advertisements in the yellow pages of the telephone directory also contain the clinic's name and Respondent's name, and again the printing of Respondent's name is always much smaller, far less bold, and inconspicuous compared to the print which contains the clinic's name. Additionally, the clinic's name frequently appears in the alphabetical listings of attorneys in the yellow pages under the first letter of the city in the name and without Respondent's name (e.g., "Merrillville Legal Clinic 769–8584").

■ It is Respondent's contention that the geographic designations which he used in naming his clinics do not constitute "trade names", and that said term has never been defined in Indiana. We disagree with his position. A trade name has in fact been defined in Indiana to include the location:

> "Trade-names are names which are used in trade to designate a particular business of certain individuals considered somewhat as an entity, or the place at which a business is located, or a class of goods, but which are not technical trademarks, either because not applied or affixed to goods sent into the market, or because not capable of exclusive appropriation, by one as trademarks." *Hartzler v. Goshen Churn & Ladder Co.*, 55 Ind.App. 455, 104 N.E. 34 (1914).

The fact that this definition was framed in 1914 does not make it any less valid as the Respondent seems to argue. Other jurisdictions have also recognized that the use of a geographic location as part of the name of a professional practice constitutes a trade name and have found such use improper. See Gen. *Friedman v. Rogers*, 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (Optometry); *In re Oldtowne Legal Clinic*, 285 Md. 132, 400 A.2d 1111 (1979) (Law).

■ It is Respondent's further contention that both, the prohibition against the use of trade names found in Disciplinary Rule 2–102(B) and the advertising regulations found in Disciplinary Rule 2–102(A) are unconstitutional restraints on useful commercial speech which is protected by the First Amendment of the Constitution of the United States.

Advertising by attorneys and its regulation has in recent years undergone new examination and re-definition. The Respondent places great emphasis on the holding by the U.S. Supreme Court in *Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). The issue decided there was an extremely narrow one, i.e., whether lawyers may advertise the prices at which certain routine services will be performed. In ruling that the flow of truthful advertisement concerning the availability and terms of routine legal services may not be restrained by the application of an Arizona Disciplinary Rule which prohibited a lawyer from publicizing himself as such in advertisements and announcements, the Supreme Court recognized that advertising by attorneys may be regulated though it may not be subjected to blanket suppression. The Court listed several instances of clearly permissible limitations, including false, deceptive or misleading advertisements, restrictions on the time, place and manner of advertising, or advertising concerning transactions that are themselves illegal. See *Virginia Pharmacy Board v. Virginia Consumer Council*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). The United States Supreme Court has recognized that advertising for professional services poses special risks for deception by stating:

> Because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising. Id. at 383, 93 S.Ct. at 2557. *In the Matter of R.M.J.*, 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982).

In *In the Matter of R.M.J., Supra*, the U.S. Supreme Court summarized the commercial speech doctrine, in the context of advertising for professional services, as follows:

> Truthful advertising related to lawful activities is entitled to the protections of the First Amendment. But when the particular content or method of the advertising suggests that it is inherently misleading or when experience has proved that in fact such advertising is subject to abuse, the States may impose appropriate restrictions.

> • • • • •

> Even when a communication is not misleading, the State retains some authority

to regulate. But the State must assert a substantial interest and the interference with speech must be in proportion to the interest served. 455 U.S. at p. 203, 102 S.Ct. at p. 937.

This doctrine emanated from the Court's earlier holdings in *Bates, Supra,* in *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978), and *Friedman v. Rogers, Supra.* In the latter case the U.S. Supreme Court specifically addressed a prohibition on the use of a trade name by a professional group, "Texas State Optical."

A trade name is, however, a significantly different form of commercial speech from that considered in *Virginia Pharmacy* and *Bates.* In those cases, the State had proscribed advertising by pharmacists and lawyers that contained statements about the products or services offered and their prices. These statements were self-contained and self-explanatory. Here, we are concerned with a form of commercial speech that has no intrinsic meaning. A trade name conveys no information about the price and nature of the services offered by an optometrist until it acquires meaning over a period of time by associations formed in the minds of the public between the name and some standard of price or quality. Because these ill-defined associations of trade names with price and quality information can be manipulated by the users of trade names, there is a significant possibility that trade names will be used to mislead the public.

The possibilities for deception are numerous. The trade name of an optometrical practice can remain unchanged despite changes in the staff of optometrists upon whose skill and care the public depends when it patronizes the practice. Thus, the public may be attracted by a trade name that reflects the reputation of an optometrist no longer associated with the practice. A trade name frees an optometrist from dependence on his personal reputation to attract clients, and even allows him to assume a new trade name if negligence or misconduct casts a shadow over the old one. (Footnote deleted) 440 U.S. at 12, 13, 99 S.Ct. at 895, 896.

We find that the same rationale proscribing the use of a trade name in the professional practice of optometry, is fully applicable to the practice of law. It is this inherently misleading characteristic which is the basis for our Disciplinary Rule. Ethical Consideration 2–11 of the *Code of Professional Responsibility* emphasizes this point by stating:

> The use of a trade name or an assumed name could mislead laypersons concerning the identity, responsibility and status of those practicing thereunder.

The entire manner of operation of Respondent's legal clinics, as revealed by these findings, suggests that there was in fact a great deal of misunderstanding as to the identity, responsibility and status of those practicing and working in the legal clinics.

In light of the foregoing considerations, we conclude that the Respondent did violate Disciplinary Rule 2–102(B) by practicing under a trade name and that said Rule is not constitutionally infirm.

The Respondent is also charged with advertising his clinics in pamphlets constituting professional notices not authorized by Disciplinary Rule 2–102, thus violating Disciplinary Rule 2–102(A). In reviewing the subject pamphlets it is extremely difficult to find a single fact which may be called useful commercial information from which a layperson can make an informed decision. The pamphlets do not contain any specific fee lists or credit arrangements. They do not even contain the name of a lawyer, not to mention his qualifications. They are in fact urging the public to use the legal clinic by making such statements as:

> "Trouble is, most legal services can set you back an arm and a leg if you consult a lawyer under normal legal circumstances. But that may be changing." Valparaiso Legal Clinic, Exhibit C–2, p. 2; Indianapolis Legal Clinic, Exhibit D, p. 2.

However, we need not further scrutinize the entire content of such pamphlets. Even if some of the information contained therein is constitutionally protected, the fact remains that they are advertised under a trade name and do not reveal the identity of the lawyers practicing thereunder. The Respondent cannot indirectly accomplish what is prohibited directly. He cannot practice under a trade name nor can he advertise such trade name. As found earlier, the inherently misleading nature of the use of trade names makes their advertisement subject to state regulation. See gen. *Friedman v. Rogers, Supra.* Thus, we conclude that the publication of advertising pamphlets under the various trade names is violative of Disciplinary Rule 2–102(A). The Respondent urges that the Rule is constitutionally infirm. We need not go beyond the issue presented to us here by Respondent's case. Respondent's advertisement of a prohibited trade name is not constitutionally protected and the regulation thereon found in Disciplinary Rule 2–102(A) is not constitutionally infirm. Respondent's further challenges to Disciplinary Rule 2–102(A) and (B) as being overbroad and selectively applied to him are wholly unsupported by any record or authority and, accordingly, we find them meritless.

The Respondent argues that the use of trade names in his practice is not violative of Disciplinary Rule 2–101(A). Said rule proscribes the use of false, fraudulent, misleading, deceptive, self-laudatory and unfair statements in any public communication. We have already found, under earlier counts, that the Respondent violated said Rule by specific false statements. In this count, however, he is charged with violating the Rule by advertising his practice under a trade name. There is no doubt that the use of a trade name is inherently misleading, particularly as to the responsibility over employees and the duty owed by lawyers. The findings under Count III, IV and V portray the operation as one in which professional responsibility and accountability could not be fixed with any one. The authority, identity and status of the clinics' staff were often unclear to the clients. This general lack of professional accountability is most apparent under Count IV, where the client's case was delayed and neglected, a receipt was given in the name of the Indianapolis Legal Clinic but yet the attorney was not the Respondent but an employee operating under the Respondent's instructions. This only convinces us further of the inherently misleading nature of practicing under a trade name. The use of such a trade name in a public communication is similarly inherently misleading.

In conclusion, we hold that the Respondent did practice under a prohibited trade name, did advertise said trade name in violation of Disciplinary Rules 2–102(A) and (B); he did use a public communication containing an inherently misleading designation in violation of Disciplinary Rule 2–101(A).

## COUNT VII

In Count VII of the complaint, the Commission incorporates the facts of all the preceeding counts and once again charges the Respondent with violating some, but not all, of the same Disciplinary Rules charged under the earlier counts. We agree with Respondent's contention that in effect he is being charged with the same violations twice, once individually under each specific count and later, cumulatively under one count. In that the charges and findings under Count VII are repetitive, we find that they should be dismissed.

Having determined that the Respondent has engaged in misconduct we must evaluate the appropriate sanction. Taken individually, the violations may not appear to be of a magnitude which would indicate a severe sanction. However, when examined as a whole, the numerous violations suggest that Respondent's entire system of clinics was operated in an unprofessional manner. The Respondent made false advertisements for free initial consultations which in fact were never given. He

allowed non-professional staff to give legal advice to clients. He blatantly neglected clients' cases and refused to return their files and fees. When complications arose in a case, the Respondent abandoned his clients.

Respondent contends throughout his pleadings that the legal clinic is a novel way of providing routine legal services at a lower price. That may well be true. However, the organization set up by the Respondent and the entire mode of operation served to diffuse the professional responsibility owed by an attorney to his clients. The professional service provided was less than adequate. The novelty in Respondent's approach was his elevation of profit over professional performance. The numerous acts of misconduct convince us that the Respondent has failed to appreciate the duty he, as an attorney, owes to every one of his clients, no matter how routine or small their cases may be.

In fulfilling our duty to set and maintain appropriate standards for the professional conduct of attorneys, we conclude that Respondent's numerous acts of misconduct found herein render him unfit to continue as a member of the Bar of this State.

It is therefore ordered that, by reason of the misconduct found under the Verified Complaint filed in this cause, the Respondent be, and he hereby is, disbarred from the practice of law in this State.

Costs of this proceeding are assessed against the Respondent.