INDIANA CIVIL RIGHTS COMMIS-
SION and William E. Barron,
Appellants–Defendants,

v.

WELLINGTON VILLAGE APART-
MENTS, Nottingham Village Apart-
ments, Appellees–Plaintiffs.

No. 49A02–9102–CV–92.

Court of Appeals of Indiana,
Second District.

July 2, 1992.

Transfer Denied Sept. 23, 1992.

Jacquelyn Thompson, Indiana Civ. Rights Com'n, Indianapolis, for appellants-defendants.

Matthew R. Clark, Clark, Quinn, Moses & Clark, Indianapolis, for appellee-plaintiff Wellington Village Apartments.

Richard A. Clem, Alden & Clem, Indianapolis, for appellee-plaintiff Nottingham Village Apartments.

SHIELDS, Judge.

William E. Barron (Barron) and the Indiana Civil Rights Commission (Commission) seek appellate review of the trial court's judgment in favor of Wellington Village Apartments (Wellington) and Nottingham Village Apartments (Nottingham).

We affirm as to Nottingham and affirm in part and reverse in part as to Wellington.

## ISSUES

1. Whether the trial court erred in finding the Commission's decision is arbitrary, capricious, an abuse of discretion, and without observance of procedure required by law in that:

a. the Commission's findings of fact are based upon answers to requests for admissions that were not properly admitted or administratively noticed;

b. the hearing officer, by engaging in ex parte communications with counsel for the Commission, did not conduct the Wellington hearing in a manner to avoid the appearance of impropriety; and

c. the hearing officer improperly restricted Nottingham's cross-examination of Barron during the Nottingham hearing.

2. Whether the trial court erred in finding a lack of substantial evidence to support the Commission's findings of discrimination.

3. Whether the trial court erred in finding the Commission exceeded its statutory authority in awarding damages for emotional distress.

4. Whether the trial court erred in finding the Commission's splitting of the damage award between Wellington and Nottingham is arbitrary, capricious, an abuse of discretion, and without observance of procedure.

## FACTS

This case involves a consolidated appeal of two separate Commission proceedings involving alleged housing discrimination by Wellington and Nottingham against Barron, an African–American. The Commission found that both apartment complexes had discriminated against Barron because of his race. The Commission awarded Barron his additional housing costs—a figure arrived at by averaging his probable housing costs at Wellington and Nottingham, then subtracting his actual costs for replacement housing. The Commission also awarded Barron $10,000 for mental distress. The Commission ordered Wellington and Nottingham to each pay half of the awards.

Both apartment complexes sought judicial review. In separate proceedings, the Marion Superior Court set aside the Commission's findings and remanded for further proceedings. Barron and the Commission seek appellate review of both decisions. In response to a joint petition, the cases were consolidated on appeal by this court.

The findings of fact, as originally recommended by the hearing officer and as amended and adopted by the Commission, are as follows:

[WELLINGTON] FINDINGS OF FACT

1. Barron is an adult black man who has resided, at all material times, in the state of Indiana.

2. Wellington is an apartment complex located on the east side of Indianapolis near one of the Interstate highways. It is a fairly large complex, having more than two hundred (200) units. Of these, eighteen (18) are three (3) bedroom apartments. The vast majority of the remainder are two (2) bedroom apartments.

3. Barron is an industrial electrician. He was employed as such at United States Steel's Gary Works for a little over seven (7) years until August of 1984 when he, along with a host of others, was laid off as part of a general reduction in force. Barron is also a licensed real estate broker and was associated with a Century 21 agency in Gary for some time.

4. After his layoff, Barron received both Supplemental Unemployment Benefits and unemployment compensation benefits. He received these benefits until such time as he commenced his employment with Ford Motor Company ("Ford") in Indianapolis.

5. Barron eventually obtained a position with Ford as an industrial electrician and began working in that capacity on April 22, 1985. This position is in the bargaining unit; however, there was a ninety (90) day probationary period during which Barron had no union protection. During 1985, Barron earned approximately Thirty–Six Thousand Dollars ($36,000.00) from Ford and during 1986, he earned about Fifty–Two Thousand Dollars ($52,000.00).

6. Until that time, Barron had resided in Gary with his family—his fiancee, who was pregnant and his three (3) year old daughter. He and his fiancee decided that he would start looking for an apartment for the family upon the completion of his probationary period.

7. Barron lived with his brother (not Charles) for about one (1) month. After that, he rented a one (1) bedroom apartment (Brigadier Apartments) on a month-to-month basis.

8. Barron's probationary period ended on July 22, 1985. Toward the end of the probationary period, he began to look at apartment complexes. He saw Wellington (from his car) and liked it.

9. Near the end of the month, Barron went to Wellington to inquire about renting an apartment. His brother Charles was with him. They entered the office and were eventually asked "May I help you?" by the lady at the counter, who has not been identified. Barron said that he would like a two (2) or three (3) bedroom apartment. She said none were available. Barron asked if anything was available and again she said no. When Barron asked if he could fill out an application, she said not unless there were apartments available. Similarly, she told him he could not leave his name and number since apartments were rented on a first come, first served basis. She did give Barron a brochure and told him, when he asked whether he should check back, to come in another month. This occurred in late July.

10. Barron returned to Wellington in the first week of September of 1985. Again, he inquired about a two (2) or three (3) bedroom apartment and was told none were available. He asked if he could see a model and was told that they did not have any. He also asked if he could leave a name and number and was told no, that apartments were rented on a first come, first served basis. When he asked if he could fill out an application, he was told "not unless something is available". Again, he was told to come back next month.

11. Barron returned to Wellington during the last week of September of 1985. Again, he was told that there were no two (2) or three (3) bedroom apartments available, given a brochure, and told to try again next month.

12. On November 21, 1985, Barron contacted a local housing authority and related his experiences in trying to rent an apartment in Indianapolis. This agency referred Barron to ICRC [Indiana Civil Rights Commission]. Before coming to ICRC, Barron made one (1) more visit to Wellington, on

November 21. Once again, he was told there were no two (2) or three (3) bedroom apartments available, given a brochure and told to inquire again next month.

13. Later on November 21, Barron filed the instant complaint with ICRC.

14. On December 11, 1985, certain employees of ICRC were sent to Wellington as testers to inquire into the availability of two (2) or three (3) bedroom apartments. Two (2) of these testers were Jaenicke, who is white, and Johnson, who is black.

15. Johnson arrived about 11:00 a.m. and spoke to a lady named Bobbie. He was told that there were no two (2) or three (3) bedroom apartments available then and to call back in the first week of January, 1986. Johnson recalls telling Bobbie that there were three (3) in his family. He also asked about completing an application and was told that this was not done unless something was available. His question about whether there was a waiting list was answered in the negative.

16. Jaenicke arrived at 1:25 p.m. and also spoke to Bobbie. Jaenicke told Bobbie that she needed a two (2) or three (3) bedroom apartment as soon as possible, or by January 1, 1986. Jaenicke told Bobbie that a three (3) bedroom apartment was needed since she and her husband had two (2) children—a four (4) year old boy and a two (2) year old girl. Jaenicke was told that Wellington definitely had a three (3) bedroom apartment (on the middle floor) that would be available in mid-January and that there might be a two (2) bedroom apartment available at about the same time. Jaenicke was also told that there were no models, that she could fill out an application later, that the rent was Four Hundred Twenty Dollars ($420.00) per month including water and sewage, that a deposit of Two Hundred Dollars ($200.00) would be required with the application, and that she should call back at the end of December.

17. Neither Johnson nor Jaenicke was actually interested in an apartment and any resemblance between the families they described and their actual families was purely coincidental. Both their interest and their families were designed to parallel Barron's

in such a way that their treatment would tend to support, or refute, Barron's claims of racial discrimination.

18. Neither Johnson nor Jaenicke had seen the instant complaint nor been advised of its allegations. Both knew that there probably was a complaint as tests were usually not conducted otherwise. Both were given their "profile" by Mary Allen ("Allen"), then ICRC's Housing investigator.

19. It is true, as Wellington notes, that Johnson could not recall in detail what all he told Bobbie. It is also true, as Wellington fails to note, that Jaenicke succeeded Allen as Housing investigator and was trained by Allen that the characteristics of testers should match those of the complainant and should also match each other. Thus, it is more likely than not that any details provided by Johnson to Bobbie matched those provided by Jaenicke.

20. Wellington also asserts that an Affidavit executed by Johnson shortly after his visit to Wellington has disappeared. The record reflects that Johnson had not reviewed his Affidavit in preparation for his appearance and that he did not have it in his possession. This does not mean or suggest that it disappeared.

21. On Saturday, December 14, 1985, Barron, at the request of ICRC staff, again visited Wellington inquiring about the availability of a two (2) or three (3) bedroom apartment. This time he spoke to a person identifying herself as Cindy, a part-time leasing agent. Cindy told Barron that she was almost positive that some were available. She looked through some papers for a list but could not find such a list.

23. [sic] Barron asked Cindy if there was a model. She said sure, and showed him a two (2) bedroom apartment. Barron also asked if he could leave his name and number and she gave him a guest card to complete.

23. On Monday, December 16, 1985, again at the request of ICRC staff, Barron visited Wellington. This time he spoke with "Bobbie" who told him that there was

nothing available and to call again next month.

24. At each time when Barron, or a tester, inquired about apartments there were vacant apartments at Wellington. A comparison of these who moved out between July 1, 1985 and December 3, 1985[1] reveals at least the following number of vacancies.

| DATE (1985) | 2 BR | 3 BR |
| --- | --- | --- |
| Last week of July (7/29) | 6 | 0 |
| First week of September (9/4) | 20 | 4 |
| Last week of September (9/25) | 20 | 2 |
| November 21 | 21 | 5 |
| December 11 | 21 | 4 |
| December 14 | 21 | 4 |

[1] This comparison was made by analyzing Exhibits 1 and 3 to Complainant's [sic] William E. Barron's Request For Admissions From Respondent Wellington Village Apartments filed June 20, 1987. These exhibits are lists of move-ins (Exhibit 1) and move-outs (Exhibit 3) for the period beginning July 1, 1985 and ending December 31, 1985. In Respondent's Answers To Complainant's Request For Admissions filed July 22, 1987, Wellington admitted that it had compiled each list.

25. Wellington did rent apartments on or after each of the dates upon which Barron, or a tester, inquired.

26. Wellington contends that it rented apartments on a first come, first served basis, that it did not maintain a waiting list, that its minority population is consistent with the surrounding area, that its leasing agents were fully aware of the laws prohibiting racial discrimination and had been advised to comply with those laws, and that Barron was treated the same as whites who inquired when no apartments were available.

27. At the heart of all these arguments is the claim that no apartments were available each time that Barron inquired. Yet, Barron has established, by admissions, that on each occasion that he inquired, Wellington had vacant apartments. Though it is true that a vacant apartment is not necessarily an available one, it is also true that, at the time of each of Barron's last four (4) visits to Wellington, there were no less than twenty-two (22) and as many as twenty-six (26) vacancies. It is too much to accept that none of these vacancies was available.

28. Moreover, when Jaenicke inquired and an apartment was not immediately available, she was given specific information about apartments that would be available soon, the deposit required, and told to check back at the end of the month. Johnson, who had been there only a few hours before was told only that nothing was available and to come back in the first week of January. Clearly, this provided Jaenicke, a white, a better opportunity to rent an apartment at Wellington than Johnson, a black, particularly considering the first come, first served practice.

29. There is no evidence of the percentage of minorities in the surrounding community (whatever that may be); therefore, it cannot be determined whether the minority population of Wellington is comparable. Furthermore, "minority" includes other categories besides race and the minority percentage may say little about racial discrimination.

30. Wellington denied Barron equal opportunity to lease an apartment because of race.

31. Barron looked at other apartments at the same time and eventually leased his current apartment where he and his family moved in on January of 1986. For this two (2) bedroom apartment, Barron paid Four Hundred Ten Dollars ($410.00) per month. Water (and, presumably, sewage) are included. Electricity is not. This rate increased effective February 1987 to Four Hundred Thirty Dollars ($430.00) per month.

32. It appears that Wellington rented a comparable apartment for Three Hundred Seventy Three Dollars ($373.00) per month. *See* C.Ex. 10. Thus, alternate housing cost Barron an additional Eight Hundred Eighty Dollars ($880.00) through August of 1987. Calculations are shown below:

$$\$410.00 - \$373.00 = \$37.00 \times 13 \text{ months} = \$481.00$$
$$\$430.00 - \$373.00 = \$57.00 \times 7 \text{ months} = \$399.00$$

TOTAL $880.00

33. Barron suffered anger, frustration, embarrassment, and inconvenience as a result of being denied the opportunity to lease an apartment at Wellington. He was

unnecessarily separated from his family for at least a few months.

34. Findings of Fact, Conclusions Of Law, And Order have been issued today in a complaint by Barron against Nottingham Village Apartment ("Nottingham"). In that case, the difference in rent totalled One Thousand Two Hundred Sixty Dollars ($1,260.00). Since Barron did not, of course, rent his current apartment twice, the only reasonable course is to average these figures and have Wellington and Nottingham each pay half.

35. Similarly, his emotional distress cannot be separately ascribed to Wellington or Nottingham. Again, the only reasonable course is for them to share equally in the liability.

36. Barron has not proven by clear and convincing evidence that Wellington's acts were malicious or in blatant disregard of Barron's rights.[2]

\* \* \* \* \* \*

[2] Obviously, in one sense of the word "malicious", all acts of racial discrimination are. The purpose of this finding, though, is to determine whether punitive damages are appropriate. Punitive damages are not appropriate in every case and thus something more than a violation must be shown. People can respond to blacks differently without consciously realizing they are doing so and there is no evidence of any racial epithets or other abusive behavior by Wellington agents.

Wellington Record at 504–11, 756–63.

## [NOTTINGHAM] FINDINGS OF FACT

1. Barron is an adult black man who has resided, at all material times, in the state of Indiana.

2. Nottingham is an apartment complex located on the east side of Indianapolis near Interstate highways 70 and 465. It has forty-eight (48) one bedroom, one bath apartments; fifty-four (54) two bedroom, two bath apartments; and one hundred eight (108) three bedroom, two bath apartments. Response to Request For Admissions (August 3, 1987).[2]

[2] These matters were admitted by Nottingham pursuant to *Ind.R.Tr.P.* 36(A) ("TR. ___"). They are, therefore, conclusively established. TR. 36(B).

3. Barron is an industrial electrician. He was employed as such at United States Steel's Gary Works for a little over seven (7) years until August of 1984 when he, along with a host of others, was laid off as part of a general reduction in force. Barron is also a licensed real estate broker and was associated with a Century 21 agency in Gary for some time.

4. After his layoff, Barron received both Supplemental Unemployment Benefits and unemployment compensation benefits. He received these benefits until such time as he commenced his employment with Ford Motor Company ("Ford") in Indianapolis.

5. Barron eventually obtained a position with Ford as an industrial electrician and began working in that capacity on April 22, 1985. This position is in the bargaining unit; however, there was a ninety (90) day probationary period during which Barron had no union protection. During 1985, Barron earned approximately Thirty–Six Thousand Dollars ($36,000.00) from Ford and during 1986, he earned about Fifty–Two Thousand Dollars ($52,000.00).

6. Until that time, Barron had resided in Gary with his family—his fiancee, who was pregnant and his three (3) year old daughter. He and his fiancee decided that he would start looking for an apartment for the family upon the completion of his probationary period.

7. Barron lived with his brother John for about one (1) month. After that, he rented a one (1) bedroom apartment (Brigadier Apartments) on a month-to-month basis.

8. Barron's probationary period ended on July 22, 1985. Toward the end of the probationary period, he began to look at apartment complexes. He saw Nottingham and liked it.

9. Near the end of the month, Barron went to Nottingham to inquire about renting an apartment. He entered and an older woman asked if she could help him. Barron told her that he was interested in a two (2) or three (3) bedroom apartment. He was told that they did not have any available, but that she did have a brochure.

She got one and gave it to him. He asked if he could leave his name and number so that they could contact him if something became available. She said that they did not take such information unless something was available. Barron asked if he could complete an application and was told not unless something was available. She suggested that he come back next month.

10. Barron returned the first week of September and essentially the same conversation recurred. This time, he was told that Nottingham rented on a first come, first served basis. Again, it was suggested that he come back next month.

11. Barron next returned to Nottingham near the end of September. Essentially the same conversation was repeated once again. Barron specifically asked about three (3) bedroom apartments, two (2) bedroom apartments, and even one (1) bedroom apartments and, for each, was told that there were none available.

12. Barron went to Nottingham for the last time on November 1, 1985 and basically the same thing occurred. Again, he was told there was nothing available.

13. On December 11, 1985, certain employees of ICRC were sent to Nottingham as testers to inquire into the availability of two (2) or three (3) bedroom apartments. Three (3) of these testers were Shockney and Jaenicke (both of whom are white) and Johnson (who is black).

14. Johnson arrived about 10:35 a.m. and asked the receptionist or agent whether any two (2) or three (3) bedroom apartments were available. He was told a three (3) bedroom was being prepared and it would be available around the first of the year. He asked if he needed to fill out an application. At first, he was told that he did not need to until it was rented but was eventually given an application to take with him.

15. Shockney arrived about 11:00 a.m. and asked about renting a two (2) or three (3) bedroom apartment. The gray haired rental agent told him that there was an apartment available on the second story though she had not realized that when she was talking to the person before him. Fur-

ther, she told him that if he didn't take that, that there may be more available around the first of the year or February. She further advised Shockney that he should call about a month before he needed an apartment.

16. Jaenicke arrived about 11:55 p.m. and said she was interested in a three (3) bedroom unit but that if none were available, a two (2) bedroom might do. Jaenicke asked Nottingham's agent her name. This question was not answered but the agent did say that she and the manager were the only people who rented apartments. Jaenicke was asked if she would like to see an open unit. When she said yes, she was given directions and went over to see a three (3) bedroom apartment. Nottingham's agent told Jaenicke that a woman had just moved out without notice and that she'd forgotten and told three (3) or four (4) people it was not available. She told Jaenicke that the unit would be available around the end of the month.

17. When Jaenicke returned to the office, Nottingham's agent told her that she would hold the unit for her. Jaenicke said "no thanks, I'm still looking." Jaenicke was told that she could not take an application with her but could fill out one later. Further, Nottingham's agent told Jaenicke that if she wasn't there when Jaenicke returned, to say she'd looked at Unit 817.[3]

[3] Jaenicke thought she'd said H–17. There is no such unit but there is an 817.

18. On December 19, 1985, two (2) more testers were sent to Nottingham. These testers, who were not employees of ICRC, were Smith, who is black, and Sparks, who is white.

19. Smith arrived about 10:00 a.m. and asked if there was a two (2) or three (3) bedroom apartment available. She was told that there was not. She asked about a waiting list and was told that there was none. She asked if she could take an application with her and was told not unless something was available. She got a similar response to her question about seeing a model. Smith requested information about deposits and rent and was given some brochures. She was told she should check

back in February, after the holidays, and to ask for Mary, the Leasing Agent.

20. Sparks arrived between 1:00 and 1:30 p.m. and told the lady she was interested in a two (2) bedroom or three (3) bedroom apartment and that she had two (2) daughters, ages three (3) and four (4). Sparks asked if there were any vacancies and was told that they had two (2) two (2) bedroom apartments vacant that were being cleaned and would be available as of January 1. Sparks asked Nottingham's agent her name and was told she was the manager but that she would be dealing with the Leasing Agent. Sparks was told that she could fill out an application that day and that there was a fee of Fifty Dollars ($50.00). At Sparks' request, she was allowed to take an application with her.

21. On November 1, 1985 (the last day Barron inquired), Nottingham had at least six (6) vacant two (2) bedroom apartments and a least one (1) vacant three (3) bedroom apartment.

22. On December 11, 1985 (the day the testers employed at ICRC inquired), Nottingham had at least five (5) vacant two (2) bedroom apartments and at least two (2) vacant one (1) bedroom apartments.

23. On December 19, 1985 (the day the testers not employed at ICRC inquired), Nottingham had at least six (6) vacant two (2) bedroom apartments and at least one (1) vacant three (3) bedroom apartment.

24. Nottingham did rent apartments on or after each of those dates.

25. At the heart of Nottingham's case is the contention that no apartments were available at the times that Barron inquired. Yet, it is clear that there were vacancies. Though it is doubtlessly true that a vacant apartment is not necessarily an available one, it is too much to accept that none of the vacant apartments were, or were about to be, available.

26. More telling than that is the fact that the white testers were all given more specific, and more encouraging, information than their black counterparts.

27. Nottingham denied Barron equal opportunity to lease an apartment because of race.

28. Barron looked at other apartments at the same time and eventually leased his current apartment where he and his family moved in on January of 1986. For this two (2) bedroom apartment, Barron paid Four Hundred Ten Dollars ($410.00) per month. Water is included. Electricity is not. This rate increased effective February 1987 to Four Hundred Thirty Dollars ($430.00) per month.

29. It appears that Nottingham rented a comparable apartment for Three Hundred Fifty Four Dollars ($354.00) per month. *See* C.Ex. 10. Thus, alternate housing cost Barron an additional One Thousand Two Hundred Sixty Dollars ($1,260.00) through August of 1987. Calculations are shown below:

$410.00 − $354.00 = $56.00 × 13 months = $728.00
$430.00 − $354.00 = $76.00 × 7 months = 532.00

TOTAL $1,260.00

30. Barron suffered anger, frustration, embarrassment, and inconvenience as a result of being denied the opportunity to lease an apartment at Nottingham. He was unnecessarily separated from his family for at least a few months.

34. [sic] Findings Of Fact, Conclusions Of Law, And Order have been issued today in a complaint by Barron against Wellington Village Apartments ("Wellington"). In that case, the difference in rent totalled Eight Hundred Eighty Dollars ($880.00). Since Barron did not, of course, rent his current apartment twice, the only reasonable course is to average these figures and have Wellington and Nottingham each pay half.

35. Similarly, his emotional distress cannot be separately ascribed to Wellington or Nottingham. Again, the only reasonable course is for them to share equally in the liability.

36. Barron has not proven by clear and convincing evidence that Nottingham's acts were malicious or in blatant disregard of Barron's rights.[4]

[4] Obviously, in one sense of the word "malicious", all acts of racial discrimination are. The purpose of this finding, though, is to deter-

mine whether punitive damages are appropriate. Punitive damages are not appropriate in every case and thus something more than a violation must be shown. People can respond to blacks differently without consciously realizing they are doing so and there is no evidence of any racial epithets or other abusive behavior by Nottingham agents.

\*    \*    \*    \*    \*    \*

Nottingham Record at 834–40, 882.

Based upon these findings, the Commission concluded Wellington and Nottingham "committed an unlawful discriminatory practice by denying Barron equal opportunity to rent an apartment." Wellington Record at 512, Nottingham Record at 841. It further concluded that Barron paid eight hundred eighty dollars ($880.00) more for alternate housing than what he would have paid at Wellington and one thousand two hundred sixty dollars ($1,260.00) more than for a Nottingham apartment, and ordered Wellington and Nottingham to each pay one-half of the total additional rent. The Commission further ordered Wellington and Nottingham to equally split the ten thousand dollar . ($10,000.00) amount it awarded to Barron for mental distress.

Wellington and Nottingham petitioned for judicial review. On October 29, 1990, the trial court determined the administrative record lacked substantial evidence to support the Commission's conclusion of unlawful discrimination by Wellington, that the Commission's award of damages for mental distress was in excess of its statutory authority, and that the Commission's findings were arbitrary, capricious, and without observance of procedure required by law in that it considered material not in evidence and failed to conduct the proceedings in a manner to avoid the appearance of impropriety. The court ordered the determination vacated and remanded the case to the Commission.

On November 7, 1990, the court made the same findings as to Nottingham and, in addition, found the Commission failed to observe proper procedure when it restricted Nottingham's cross-examination of Barron.

Barron and the Commission appeal. .

## DISCUSSION

### I.

Barron and the Commission claim the trial court erred in determining the Commission's decision is arbitrary, capricious, an abuse of discretion, and without observance of procedure required by law in several respects: a. considering material not in evidence; b. the hearing officer's ex parte communication with the Commission's attorney in the Wellington hearing; and c. improperly restricting Nottingham's cross-examination of Barron.

### A.

■ Although the rules of evidence are relaxed in an administrative hearing, those rules still apply nonetheless; "[t]he order of an administrative tribunal must be based on evidence produced at the hearing where there is an opportunity for all interested parties to offer evidence, cross-examine witnesses, and argue their positions." *Oriental Health Spa v. City of Fort Wayne* (1988), Ind.App., 526 N.E.2d 1019, 1022 (administrative notice may not be taken without disclosure and opportunity to object at hearing). Thus, an agency must base its decision on evidence received during the administrative hearing, including material which it administratively notices after giving notice to the parties "before or during the hearing, or before the issuance of any order ... of the specific facts or material noticed, and the source of the facts or material noticed ... and afford[ing] an opportunity to contest and rebut the facts or material noticed...." IC 4–21.5–3–26(g)(1), (2) (1988).

■ This alleged error involves the proper method of admitting into evidence answers to a request for admission by administrative notice. The function of a request for admission is to establish a fact. Thus, once the party admits the matter contained in the request, the need to prove the fact at trial is eliminated. 3 *William F. Harvey, Indiana Practice,* § 36.1 (2d ed. 1992). The fact is conclusively established unless the court, on motion, permits a withdrawal or an amendment pursuant to

Ind. Trial Rule 36. However, this does not mean that the fact is automatically admitted into evidence. Answers to a request for admission may be admitted into evidence in two ways. First, an admission may be offered into evidence at the hearing where the facts established in that admission are not subject to dispute, but the admissibility of the facts may be challenged.[1] Second, an admission may be administratively noticed pursuant to I.C. 4–21.5–3–26,[2] which provides for both notice to the parties and an opportunity to object to the admissibility of the admission.

■ In this case, although Wellington's and Nottingham's answers to Barron's requests for admission were part of the record, pursuant to IC 4–21.5–3–33(c) (1988), the requests and answers were not offered into evidence at the respective hearings. However, in the Wellington proceeding, the hearing officer, in his recommended findings of fact, notified Wellington of his reliance upon the material in Wellington's answers to the requests and afforded Wellington an opportunity to contest and rebut the material in objections to the recommended findings. Therefore, by administrative notice, the material in the request for admission is evidence upon which the Commission could rely in making its findings of fact. Further, we note that Wellington was not prejudiced by the administrative notice. A summary of the relevant material is in the record as Complainant's Exhibit 13.[3]

Therefore, the trial court erred when it determined the Commission erred in considering the material in Wellington's request for admission in making its factual findings in the Wellington proceeding.

■ However, the trial court did not err in determining the Commission erred in considering the material concerning Nottingham that was the subject of Barron's request for admission in that proceeding. With the exception of data concerning the complex in finding of fact number 2, Nottingham's answers to Barron's request for admission are *not* evidence, because the hearing officer's recommended findings did not give Nottingham notice of the specific facts or material noticed and the source of those facts and materials noticed either before or during the hearing or before the issuance of any order as required by IC 4–21.5–3–26(g)(1) (1988).

Therefore, because the relevant material in the request for admission was neither offered into evidence, read into evidence, nor the subject of a request for or an act of administrative notice, the trial court properly concluded the Commission erred in considering that material in making its factual findings as to Nottingham.

### B.

Barron and the Commission argue the trial court erred in determining the Commission's decision as to Wellington is arbitrary, capricious, an abuse of discretion, and without observance of proper procedure and capriciousness of the proceedings, in that the proceeding was not conducted in

---

1. "While Rule 36 contains no express provision to this effect, it seems clear that pertinent objections to admissibility may be interposed at the trial to admissions made under Rule 36 in the same manner as they may be interposed to depositions introduced at trial." 4A *James W. Moore, Federal Practice*, § 36.08 (2d ed. 1992).

2. I.C. 4–21.5–3–26(f) and (g) provide:

   (f) Official notice may be taken of the following:
   (1) Any fact that could be judicially noticed in the courts.
   (2) The record of other proceedings before the agency.
   (3) Technical or scientific matters within the agency's specialized knowledge.

   (4) Codes or standards that have been adopted by an agency of the United States or this state.
   (g) Parties must be:
   (1) Notified before or during the hearing, or before the issuance of any order that is based in whole or in part on facts or materials noticed under subsection (f), of the specific facts or material noticed, and the source of the facts or materials noticed, including any staff memoranda and data; and
   (2) Afforded an opportunity to contest and rebut the facts or material noticed under subsection (f).

3. Although the exhibit was admitted conditionally to afford Wellington the opportunity to dispute its accuracy, it did not do so.

a manner to avoid the appearance of impropriety and to promote public confidence in the integrity and impartiality of the administrative process. In dispute is the alleged conduct of the hearing officer and the Commission attorney retiring to a stairwell during recesses "presumably to smoke a cigarette at which time no one else was present." Wellington's Brief at 37. Wellington's admission of its ignorance as to the content of any conversation that may have taken place in the stairwell emphasizes the rationale for the requirement that a contemporaneous record with respect to events occurring off the record must be made in order to preserve an issue of this type for review. *See Lilley v. City of Carmel* (1988), Ind.App., 527 N.E.2d 224, 227. There is no reviewable issue.

### C.

Barron and the Commission contend the trial court erred in finding the hearing officer failed to observe proper procedure during the Nottingham hearing. The hearing officer refused to allow Nottingham to question Barron as to the specific discriminatory acts upon which he was relying. Our disposition of Issue I renders this issue moot.

### II.

Barron and the Commission argue the trial court erred in determining the Commission's finding of unlawful discrimination against Barron by both Wellington and Nottingham is not supported by substantive evidence. The Commission claims the material in the respective requests for admission provide the necessary substantial evidence.

■ Judicial review of an administrative decision is limited to a determination of whether the agency has jurisdiction over the matter and whether its order is in accordance with proper legal procedure, is based on substantial evidence, and does not violate any constitutional, statutory, or legal principle. *See* IC 4-21.5-5-14(d) (1988); *Indiana State Prison and State Employees' Appeals Comm'n v. Van Ulzen* (1991), Ind.App., 567 N.E.2d 1164, 1166. The reviewing court neither reweighs the evidence nor rejudges the credibility of witnesses and gives considerable weight to the administrative agency's interpretation of its statutory power. *Indiana State Prison*, 567 N.E.2d at 1167. The scope of review determines whether substantial evidence exists to support the agency's finding and whether or not that finding is arbitrary, capricious, or an abuse of discretion under the facts. *Id.* at 1166-67. The agency's decision is reversed only upon finding the agency misconstrued the meaning of the statute or that its action is contrary to law. *Id.* at 1167. Also, if the Commission's findings have a reasonably sound basis of evidentiary support based on a review of the record in its entirety, the trial court is obligated to uphold the agency's decision. *Indiana Alcoholic Beverage Comm'n v. River Road Lounge, Inc.* (1992), Ind.App., 590 N.E.2d 656.

■ A claimant in a racial discrimination proceeding presents a prima facie case of discrimination upon proof that: the claimant is a member of a racial minority; the claimant applied for and was qualified to rent certain property; the claimant was rejected; and the rental opportunity remained available thereafter. *See Davis v. Mansards* (1984), N.D.Ind., 597 F.Supp. 334, 345 (court applied same prima facie test in finding landlord's unwillingness to rent apartment to African–American tenants constituted racial discrimination); *see also Ali v. Greater Fort Wayne Chamber of Commerce* (1987), Ind.App., 505 N.E.2d 141 (court applied same prima facie test for discrimination in employment based upon national origin); *Indiana Dep't of Corrections v. Indiana Civil Rights Comm'n* (1985), Ind.App., 486 N.E.2d 612, 617–18 & n. 6 (citing *Texas Dep't. of Community Affairs v. Burdine* (1981), 450 U.S. 248, 254–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 which describes the presumption that arises from a prima facie case and shifts the burden of proof, and *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, which sets forth the prima facie test for

racial discrimination in the employment context).

■ Once the claimant successfully establishes the prima facie case, a presumption of discrimination is raised, and the burden shifts to the opposing party to articulate a legitimate, non-discriminatory reason for its conduct. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If the opposing party meets this burden, the claimant must prove, by a preponderance of the evidence, the proffered reason is pretextual "by demonstrating either directly that the [opposing party] actually harbored discriminatory motives or indirectly by showing that the reasons advanced by the [opposing party] were, in the context of the surrounding circumstances, unworthy of credence." *Indiana Dep't. of Corrections*, 486 N.E.2d at 618.

■ The Commission's implicit determination that Barron made a prima facie case is correct.

The existence of the first element of Barron's prima facie case—proof that he is a member of a racial minority—is undisputed, as are his qualifications to rent an available apartment.

The remaining elements of Barron's prima facie case are established as to Wellington by the material that was administratively noticed and summarized in Complainant's Exhibit 13. This material consists of summaries of Wellington's occupancy logs for July through December 1985. The logs reveal the move-in and move-out dates for tenants in two and three bedroom apartments and record that during the period Barron sought housing, and, in particular, during the time of Barron's last four visits, there "were no less than twenty-two (22) and as many as twenty-six (26) vacancies." Wellington Record at 509. This substantial number of vacancies reasonably supports the finding that although some of those vacancies were not immediately available (due to repairs, painting, or cleaning), some apartments were available. The material also establishes that Wellington rented twenty-three (23) two and three bedroom apartments between September 1, 1985 and December 16, 1985, at a time when Barron

was seeking an apartment. This evidence supports the determination Barron was denied the opportunity to rent an available apartment that was thereafter rented to another person.

■ Also, there is evidence which supports the finding Wellington's reason for its conduct was pretextual. Unlike the Caucasian tester, neither Barron nor the African–American tester was "given specific information about apartments that would be available soon, the deposit required," nor told to check at the end of the month. Wellington Record at 509–10. Such information provided the Caucasian tester "a better opportunity to rent an apartment at Wellington than [the African–American tester and Barron], particularly considering the first come, first served practice." *Id.* at 510.

The trial court erred in determining the finding of discrimination of Barron by Wellington is not supported by substantial evidence.

■ However, the trial court did not err in making this same determination as to Nottingham. On appeal, Barron and the Commission acknowledge that the material in the respective request for admission is necessary evidence to support the Commission's finding of discrimination—and, in particular, the evidence of available vacancies that were subsequently rented. Hence, our resolution of Issue I determines the trial court did not err in determining the finding of unlawful discrimination against Nottingham is not supported by substantial evidence—the determination of discrimination is based upon material that was not "in evidence," i.e., findings of fact 21–24, inclusive.

### III.

■ Barron and the Commission claim the trial court erred in reversing the Commission's award of damages for emotional distress.

IC 22–9–1–6(k)(1)(A) (1988) authorizes an administrative agency, upon a finding of unlawful discriminatory practice, to restore

a complainant's losses incurred as a result of that discrimination as it "may deem necessary to assure justice; however, this specific provision when applied to orders pertaining to employment shall include only wages, salary, or commissions." In *Indiana Civil Rights Comm'n v. Holman* (1978), 177 Ind.App. 648, 380 N.E.2d 1281, this court defined "losses" as "pecuniary losses which can be proved with some degree of certainty, such as where a person has been denied employment, or living accommodations, or business in violation of the Civil Rights Act where that violation results in actual pecuniary loss." *Id.* 380 N.E.2d at 1285. It then held the Commission had exceeded its statutory powers by awarding monetary compensation for a racial insult made by a landlord to a tenant, noting the agency was limited to those powers specifically conferred by statute.

This court expounded on its interpretation of an agency's statutory authority in *Indiana Civil Rights Comm'n v. Midwest Steel:*

> The purpose of the limitation that "orders pertaining to employment shall include only wages, salary or commissions," is to prohibit an award of *monetary damages* for feelings of embarrassment or insult which may arise out of discriminatory acts such as sexual harassment.

(1983), Ind.App., 450 N.E.2d 130, 140 (emphasis in original). Subsequent rulings have followed suit by refusing to uphold awards for emotional distress. *See, e.g., Indiana Civil Rights Comm'n v. Union Township Trustee* (1992), Ind.App., 590 N.E.2d 1119 (Commission exceeded statutory authority in awarding emotional distress and punitive damages to employee for employer's inappropriate sexual advances); *Crutcher v. Dabis* (1991), Ind.App., 582 N.E.2d 449 (Commission's award of $28,000 for emotional distress damages and $2,000 for punitive damages to interracial married couple who obtained default judgment

against discriminating landlord exceeded the agency's statutory power).

The Commission specifically awarded ten thousand dollars ($10,000.00) to Barron for emotional distress and ordered Nottingham and Wellington to each pay half. Because "emotional distress" damages do not fall within the purview of IC 22–9–1–6(k)(1)(A), the trial court properly determined the Commission exceeded its statutory authority in awarding such damages.

## IV.

Barron and the Commission claim the trial court erred in determining the Commission's decision in Nottingham to split the damages for rent differential (and emotional distress) equally between Nottingham and Wellington is arbitrary, capricious, an abuse of discretion, and without observance of procedure.[4] We do not reach this issue because the discrimination finding, the predicate for damages, is not supported by substantial evidence.[5]

The judgment of the trial court is affirmed as to Nottingham in that the court correctly found the Commission's finding of discrimination is not supported by substantial evidence; the judgment of the trial court is affirmed as to Wellington in so far as it finds the Commission established the requirements for judicial review and holds the Commission's award of damages for mental distress exceeds the Commission's statutory authority; in all other matters, the judgment is reversed and cause remanded to the trial court for further proceedings consistent with this opinion.

MILLER and BARTEAU, JJ., concur.

---

**4.** The Commission's decision in Wellington that Wellington pay one-half of the damages for rent differential is not an issue on appeal.

**5.** We also note that during the administrative hearing, Barron conceded he was not seeking compensation for out-of-pocket expenses.