**INDIANA CIVIL RIGHTS COMMISSION, and James Carter Bauermeister, Appellants–Respondents,**

v.

**SOUTHERN INDIANA GAS & ELECTRIC COMPANY, Appellee–Petitioner.**

No. 26A04–9405–CV–209.

Court of Appeals of Indiana, Fourth District.

March 31, 1995.

Transfer Denied Aug. 15, 1995.

Jacquelyn Thompson, Indianapolis, for appellants.

Arthur D. Rutkowski, Bowers, Harrison, Kent & Miller, Evansville, for appellee.

## OPINION

RILEY, Judge.

Respondents–Appellants James Carter Bauermeister and the Indiana Civil Rights Commission (the Commission) seek appellate review of the Gibson County Circuit Court's judgment in favor of Petitioner–Appellee Southern Indiana Gas & Electric Company (SIGECO) in Bauermeister's action concerning discrimination based on a disability.[1]

We reverse.

## ISSUES

Bauermeister and the Commission raise two issues on review which we restate as:

---

1. "Disabled" and "disability" have been substituted for "Handicapped" and "handicap" except in quotations and statutes.

1. Did the trial court go beyond the scope of its review by reweighing the evidence, and substituting its opinion for that of the Commission?

2. Did the trial court err by finding that the Commission's findings are not supported by substantial, reliable and probative evidence?

3. Did the trial court err by finding that SIGECO did not receive a fair hearing because the hearing officer was biased and prejudiced against SIGECO?

### FACTS

Bauermeister, while employed as a laboratory technician by SIGECO, unsuccessfully applied for transfer to an electrical maintenance position. At the time of this application, and indeed during his entire employment at SIGECO, Bauermeister had the use of only one hand. This condition was due to an industrial accident which occurred in 1968 when Bauermeister was 17 years old. The accident left him with a metal prosthetic hook to substitute for the lost appendage. He was hired as a laboratory technician or "lab man" by SIGECO in 1977.

In July, 1985, Bauermeister applied to Henry Woodall, SIGECO's supervisor of employment, for transfer to the electrical maintenance department as part of an apprenticeship program (Apprentice Electrician) at the A.B. Brown Generating Plant (the Plant).[2] Bauermeister had applied unsuccessfully for similar positions a number of times from 1977 to 1985.

Bauermeister interviewed with Woodall who determined that Bauermeister met the initial requirements of the position. Woodall referred Bauermeister to Millard New, superintendent of the Plant for an on-site interview. (Comm'n R. at 950, 952).[3] Bauermeister interviewed at the Plant with New and also with Jim Dillman, maintenance supervisor, and Dave Baggett, electrical maintenance foreman. *Id.* at 1105. Later, New asked Dennis Glancey, who had been employed as a chemist and supervised Bauermeister at Culley Lab, for a recommendation.

New had the authority to fill the open positions at the Plant and made the ultimate decision to reject Bauermeister's application. New hired five non-disabled applicants who had never worked at SIGECO for the open positions.

On October 1, 1985, Bauermeister filed a complaint of discrimination with the Commission alleging that SIGECO rejected his application for Apprentice Electrician on the basis of his disability.

On September 26, 1991, a hearing officer for the Commission entered Findings of Fact and Conclusions of Law for the benefit of the Commission. SIGECO filed objections to the recommended decision; however, the Commission agreed with the hearing officer and found specifically in its final order:

> Evidence indicates that [Bauermeister] was at least as qualified as three of the five applicants hired after [Bauermeister]'s request for transfer to the electrical maintenance position. There is also evidence to indicate that [SIGECO] did not seek Dennis Glancey's recommendation for [Bauermeister] until after it had denied [Bauermeister] for transfer and he requested a review of this decision. Evidence further indicates that at least one [SIGECO] official indicated that [SIGECO]'s concern was [Bauermeister]'s loss of his right hand, and not his safety record or qualifications.

*Id.* at 9.

SIGECO petitioned for judicial review and, on January 31, 1994, the Gibson Circuit

---

2. Bauermeister applied for a position as Apprentice Electrician—First Six Months Beginner's Classification. This position is the first step of a four-year, eight-step training program. After an Apprentice Electrician has completed the program, he is given an examination and upon passing is advanced to Electrician. (Comm'n R. at 455). If at any time during an apprenticeship the employee fails to make sufficient progress in any step of the program, the employee remains in that step of the program until he qualifies for the next step. If it is determined that he has insufficient ability to complete the apprenticeship, he may be terminated at any time. *Id.* at 427.

3. We shall cite to the record of the proceedings before the Gibson County Circuit Court as "(R. at)", and to the record of the proceedings before the Commission as "(Comm'n R. at)."

Court issued extensive findings of fact and conclusions of law, which included:

4. The evidence in this case establishes by a standard of substantial evidence that the Commission was correct in findings:

a. Petitioner is a member of a protected class; and

b. Petitioner established he was otherwise qualified for the position sought.

The evidence does not, as a matter of law, establish by a preponderance that the Petitioner was, "... (excluded) from equal opportunities because of (2) ... handicap...." I.C. 22–9–1–3.

5. The inferences taken by the [Commission] to substantiate its decision, as made by the Hearing Officer, are not borne out by the evidence, and are not reasonably made.

6. The record of this matter demonstrates that the provisions of I.C. 4–22–1–18, now I.C. 4–21.5–5–11 in part, are not met, in that the decision of the Commission was arbitrary, capricious, an abuse of discretion, and not in accordance with law; that it was without observance of procedure required by law; and that the decision is unsupported by substantial, reliable and probative evidence.

7. The decision of the [Commission] in this cause must be set aside and is void for the reasons stated.

8. The proper remedy for resolution of this case is to set aside the decision of the [Commission], and the remand of the matter to the [Commission], for re-hearing in compliance with the findings of this Court.

(R. at 39–40) (citation omitted). It is from this decision that Bauermeister and the Commission appeal. Additional facts will be supplied as necessary.

## DISCUSSION

### I.

■ Initially, we examine whether the trial court went beyond the scope of its review. Bauermeister argues that the court failed to apply the proper legal analysis, reweighed the evidence, and substituted its opinion for that of the Commission. We agree.

■ Judicial review of agency decisions is governed by the Administrative Orders & Procedures Act, IND.CODE 4–21.5–1–1, *et seq.* When a trial court, in the first instance, or an appellate court, on appeal, reviews an agency decision, it is bound by the findings of fact made by the agency if those findings are supported by substantial evidence. *Hamilton County Dep't of Pub. Welfare v. Smith* (1991), Ind.App., 567 N.E.2d 165, 168. A trial court may not reweigh the evidence before the agency or judge witness credibility; neither may a court substitute its judgment for that of the agency, that is, it cannot reverse a decision because it would have reached a different result on the evidence presented. *Indiana Dep't of Natural Resources v. United Refuse* (1992), Ind.App., 598 N.E.2d 603, 607, *opinion adopted in part and vacated by* 615 N.E.2d 100; *May v. Dep't of Natural Resources* (1991), Ind.App., 565 N.E.2d 367, 375. The agency's decision is presumed to be correct in view of its expertise, and the trial court is bound by the agency's findings of fact if those facts have a reasonably sound basis of evidentiary support based on a review of the record in it entirety. *Bloomington v. Delta Treatment Center* (1990), Ind.App., 560 N.E.2d 556, 558; *Smith,* 567 N.E.2d at 167–68; *see also Indiana Civil Rights Comm'n v. Sutherland Lumber* (1979), 182 Ind.App. 133, 394 N.E.2d 949, 951–52.

■ However, despite the great weight afforded an administrative body's findings, an agency's determination of ultimate fact, defined as factual conclusions derived from basic facts, is subject to a reasonableness standard. *Ali v. Greater Ft. Wayne Chamber of Commerce* (1987), Ind.App., 505 N.E.2d 141, 143. Because findings of ultimate fact represent inferences drawn by the agency, they are not subject to scrutiny for evidentiary support in the record; the reasonableness of the agency's inferences is a question of law appropriate for judicial determination. *L.S. Ayres v. Indianapolis Power & Light* (1976), 169 Ind.App. 652, 664–65, 351 N.E.2d 814, 823; *Smith,* 567 N.E.2d at 168 (A reviewing court is not bound by an agency's interpretation of law and is free to deter-

mine any legal question which arises out of the administrative action.).

■ In its decision, the trial court stated: This Court feels that it is important to note that the hearing conducted by the Hearing Officer, which was adopted *in toto* by the commission as its ruling, was composed almost entirely by review by the Hearing Officer of recorded testimony, that is, deposition. This was done by stipulation of the parties, with the knowledge and approval of the Hearing Officer, as shown by his Pre–Trial Orders. Only the testimony of witnesses Bauermeister and Penfield were heard "live" by the Hearing Officer. As a result, much of the results of the Hearing were of a two-dimensional nature. This Court would thus be in much the same position as the Hearing Officer, at least as to the deposition testimony. For that matter, so would any appellate court reviewing the action of this Court. (R. at 24) (emphasis in original). The trial court candidly indicated that it considered its standard of review to go beyond determining whether there was substantial evidence to support the Commission's findings of fact. As a reviewing court, the trial court was prohibited from "weigh[ing] conflicting evidence, which appears in the record of the hearing, for the purpose of determining for whom it preponderates." *Indiana Educ. Employment Relations Bd. v. Board of School Trustees of Baugo Community Schools* (1978), 176 Ind.App. 680, 682, 377 N.E.2d 414, 416. It is not clear from our reading of the record and trial court's decision that it, in fact, did not go beyond the scope of its review of the Commission's findings of facts, and did not engage in its own weighing of the evidence. Because the trial court may have exceeded the scope of its review, it erred in reversing the Commis-

sion's findings and its decision cannot stand. *See United Refuse,* 598 N.E.2d at 607.

■ However, because our role in reviewing an agency decision is similar to that of the trial court's, we shall determine whether the Commission's findings of facts are based on substantial evidence and the conclusions of law have a reasonably sound basis of evidentiary support. *Indiana Civil Rights Comm'n v. Muncie* (1984), Ind.App., 459 N.E.2d 411, 417. If a reasonable person would conclude that the evidence and the logical and reasonable inferences therefrom are of such a substantial character and probative value so as to support the administrative determination, then the substantial evidence standard of I.C. 4–21.5–5–14(d)(5) is met. *Indiana Civil Rights Comm'n v. Weingart* (1992), Ind.App., 588 N.E.2d 1288, 1289.[4]

## II.

Inasmuch as the parties disagree on the proper legal standard to be applied in the present case, we shall examine the legal framework to be applied in cases of discrimination based on disparate treatment, and specifically discrimination based on disability.

■ In interpreting and applying Indiana Civil Rights Law, Indiana courts have found it appropriate to analyze federal court decisions interpreting Title VII of the Federal Civil Rights Act, 42 U.S.C. 2000e, *et seq. Indiana Civil Rights Comm'n v. Culver Educ. Found.* (1989), Ind., 535 N.E.2d 112, 115. Indeed, our decisions and that of our supreme court have specifically adopted the federal standard prescribed by the U.S. Supreme Court in *Texas Dep't of Community Affairs v. Burdine* (1981), 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207; *Culver Educ. Found.,* 535 N.E.2d at 115; *Indiana Dep't of Correction v. Indiana Civil Rights*

---

4. SIGECO urges that we should "defer to the judicial discretion of the Trial Court, much as the [appellate] Court defers to the Trial Court in its granting of a new trial. When an alleged error is within the discretion of the Trial Court, the Court's decision should not be reversed absent a showing of prejudice by the appealing party." Appellee's Brief at 10–11 (citations omitted). This argument must fail. In reviewing administrative decisions, a lower court is bound by the Administrative Orders and Procedures Act, I.C.

4–21.5–5–1, *et seq.,* and the cases thereunder. There are neither provisions in this legislation nor judicial precedent, including that cited by SIGECO, describing the functions of a court reviewing an administrative decision as being "discretionary." Similarly, SIGECO's proposition that, on appeal of a reviewing court's decision, the appellant has the burden of showing prejudice cannot be, and in this instance is not, supported by authority.

*Comm'n* (1985), Ind.App., 486 N.E.2d 612, 616–18, *reh'g denied, trans. denied; Indiana Civil Rights Comm'n v. Muncie* (1984), Ind. App., 459 N.E.2d 411, 418–19. Thus, we shall look to recent federal case law to clarify the somewhat illusive standard which we employ in cases of disparate treatment.

■ According to Chief Judge Posner, writing for the Seventh Circuit in *Troupe v. May Dep't Stores* (1994), 7th Cir., 20 F.3d 734, different kinds and combinations of evidence can create triable issues of intentional discrimination or disparate treatment in the employment setting. *Id.* at 736. "One kind is evidence that can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Troupe*, 20 F.3d at 736; *see Mojica v. Gannett Co.* (1993), 7th Cir., 7 F.3d 552, 561 *cert. denied,* —— U.S. ——, 114 S.Ct. 1643, 128 L.Ed.2d 363. This direct evidence is unobtainable for most claimants, *Perryman v. Johnson Products* (1983), 11th Cir., 698 F.2d 1138, 1141; *see United States Postal Serv. Bd. of Governors v. Aikens* (1983), 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."), and circumstantial evidence is also admissible to provide a basis for drawing an inference of intentional discrimination. *Troupe*, 20 F.3d at 736.

■ Circumstantial evidence can be divided into three categories, the third of which is relevant to the present case.[5] This is evidence that "the [claimant] was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Id.* (citing *St. Mary's Honor Center v. Hicks* (1993), ——

U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407).

■ In cases of disparate treatment based on circumstantial evidence, our courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; and its progeny. Under this framework, the claimant has the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Weingart*, 588 N.E.2d at 1289. By establishing a prima facie case, the claimant shows that his employer's conduct "did not result from the two most common legitimate reasons on which an employer might rely ...: an absolute or relative lack of qualification or the absence of a vacancy in the job sought." *International Bhd. of Teamsters v. United States* (1977), 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866, n. 44, 52 L.Ed.2d 396. Once established, the prima facie case raises a legal presumption of discrimination in the claimant's favor, requiring the employer to articulate clearly and specifically a legitimate, nondiscriminatory reason for its conduct, thus "fram[ing] the factual issue with sufficient clarity so that the [claimant] will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 254, 255–56, 101 S.Ct. at 1094, 1094–95; *Indiana Civil Rights Comm'n v. Wellington Village Apartments* (1992), Ind.App., 594 N.E.2d 518, 530, *trans. denied.* The employer need not, at this point, prove that the reason alleged was the actual reason, he must simply allege it. *St. Mary's Honor Center,* —— U.S. at ——, 113 S.Ct. at 2748. If such reasons are put forth, the claimant, who at all times retains the burden of proving discrimination, may attempt to demonstrate that the proffered reasons are pretextual. *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Weingart*, 588 N.E.2d at 1290. This framework is designed as a "sensible,

---

5. Of the remaining two types of circumstantial evidence, the first includes "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Troupe*, 20 F.3d at 736 (citing *Giacoletto v. Amax Zinc Co.* (1992), 7th Cir., 954 F.2d 424; *Holland v. Jefferson Nat'l Life Ins.*

(1989), 7th Cir. 883 F.2d 1307, 1314–15 *reh'g denied*). The second is evidence, "whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic ... on which an employer is forbidden to base a difference in treatment received systematically better treatment." *Troupe*, 20 F.3d at 736 (citing *American Nurses' Ass'n v. Illinois* (1986), 7th Cir., 783 F.2d 716, 728).

orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Constr. Corp. v. Waters* (1978), 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957; *but see Loyd v. Phillips Bros.* (1994), 7th Cir., 25 F.3d 518, 523 ("The factual setting of a dispute, not an abstracted formulation never intended to be all things to all cases, will determine what steps a plaintiff needed to have taken in order to sufficiently demonstrate that discriminatory decisionmaking may have actually affected *his* employment situation." (emphasis in original)).

We have previously described the claimant's burden of proof in *Wellington Village:*

> If the [employer] meets [his burden of production], the claimant must prove, by a preponderance of the evidence, the proffered reason is pretextual "by demonstrating either directly that the [employer] actually harbored discriminatory motive or indirectly by showing that the reasons advanced by the [employer] were, in the context of the surrounding circumstances, unworthy of credence."

*Wellington Village,* 594 N.E.2d at 530 (citations omitted) (quoting *Indiana Dep't of Correction v. Indiana Civil Rights Comm'n,* 486 N.E.2d at 618); *see also Indiana Civil Rights Comm'n v. Muncie,* 459 N.E.2d at 418 (citing *McDonnell Douglas,* 411 U.S. at 807, 93 S.Ct. at 1826–27). This approach to the claimant's burden of proof, classified as the "pretext-only" rule by one commentator,[6] represents one of three approaches taken by the federal courts who have generally been unclear on what constitutes a showing of pretext. *Anderson v. Baxter Healthcare Corp.* (1994), 7th Cir., 13 F.3d 1120, 1122; *see Duffy v. Wheeling Pittsburgh Steel Corp.* (1984), 3rd Cir., 738 F.2d 1393, 1396 *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (A finding that the employer's proffered justification is false is equivalent to

a finding that the employer intentionally discriminated.); *Visser v. Packer Eng'g Ass'n* (1991), 7th Cir., 924 F.2d 655, 657 (If the employer offers a pretext for why it fired the employee, the factfinder is permitted, although not compelled, to infer intentional discrimination.); *Medina–Munoz v. R.J. Reynolds Tobacco* (1990), 1st Cir., 896 F.2d 5, 9 (A claimant must do more than simply refute or cast doubt on the company's rationale for the adverse action. He must also show a discriminatory animus based on the forbidden characteristic.).

■ In an effort to untangle and clarify the competing analyses of "pretext," the Supreme Court addressed a claimant's burden of proof under the *McDonnell Douglas* framework in *St. Mary's Honor Center,* ⸺ U.S. ⸺, 113 S.Ct. 2742, and specifically rejected an Eighth Circuit holding which found that once an employer's proffered reasons for his conduct were determined to be false, the claimant was entitled to a judgment as a matter of law.[7] *Id.* ⸺ U.S. at ⸺, 113 S.Ct. at 2749. The Supreme Court held:

> The fact-finder's disbelief of the reasons put forward by the [employer] (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the [employer]'s proffered reasons, will *permit* the trier of fact to infer the ultimate fact of intentional discrimination and the Court of Appeals was correct when it noted that, upon such rejection, "no additional proof of discrimination is *required*."

*Id.* (emphasis in original).

■ Judge Kanne of the Seventh Circuit, commenting on *St. Mary's Honor Center* in *Anderson* noted that the Supreme Court found that although a claimant is not entitled to judgment as a matter of law simply be-

---

6. *See* Catherine J. Lanctot, *The Defendant Lies and the Plaintiff: The Fallacy of the "Pretext–Plus" Rule in Employment Discrimination Cases,* 43 Hastings L.J. 57 (1991).

7. Bauermeister argues that *St. Mary's Honor Center* had not been decided by the time the Commission issued its findings, conclusions, and order and thus is inapplicable to the instant case.

However, this argument must fail. *St. Mary's Honor Center* merely clarified prior decisions, it did not overturn past precedent or decide a new issue, and thus there is no reason to apply such a decision only prospectively. *See McKenna v. Pacific Rail Serv.* (1994), 3rd Cir., 32 F.3d 820, 831 n. 11 *reh'g denied.*

cause he proves his prima facie case and shows that the employer's proffered reasons for his discharge are false, he may prevail by establishing a prima facie case and by showing that the employer's proffered nondiscriminatory reason for his discharge are factually false. *Anderson*, 13 F.3d at 1124. This permits the "trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749. "[N]o additional proof of discrimination is *required*." (emphasis in original).[8] *Id.* However, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the [claimant] remains at all times with the [claimant]." *Id.* at —, 113 S.Ct. at 2747 (citation omitted). "As such, the plaintiff might be well advised to present additional evidence of discrimination, because the factfinder is not *required* to find in [his] favor simply because [he] establishes a prima facia case and shows that the employer's proffered reasons are false." *Anderson*, 13 F.3d at 1124 (emphasis in original).

Turning to the case at hand, Bauermeister contends that the Gibson County Court erred by finding that the evidence failed to show that SIGECO rejected Bauermeister for the Apprentice Electrician position because of his disability.[9]

 The determination of whether Bauermeister established a prima facie case is a question of law and is properly addressed by this court. *Indiana Civil Rights Comm'n v. Washburn Realtors* (1993), Ind. App., 610 N.E.2d 293, 295. Keeping in mind that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094, a claimant in a case of discrimination based on disability must show that he suffers from a disability; that there was a position available for which he was qualified; and that the position was given to a person who was not disabled.[10] *West v. Russell Corp.*, 868 F.Supp. 313 (M.D.Ala.1994).

 The Commission's determination that Bauermeister made a prima facie case is correct. It is undisputed that Bauermeister suffers from a disability, the absence of his right hand. It is also undisputed that in 1985, SIGECO hired five Apprentice Electricians. The "Job Vacancy Notice" submitted by SIGECO required that applicants have "prior experience and/or training in electrical maintenance[,] associate degree in electronics[, and] physically able to perform heavy work." (Comm'n R. at 483). Bauermeister had worked at SIGECO for eight years when he applied for the Apprentice Electrician position. He had an associate degree in electronics from Vincennes University and additional training from Purdue University. SIGECO rejected Bauermeister and hired five non-disabled applicants.

SIGECO is incorrect when it argues that "there was no evidence presented to the Hearing Officer showing that Bauermeister was qualified for the position to which he requested transfer." Appellee's Brief at 18. In the same paragraph, SIGECO admits that its Personnel Department determined that

---

**8.** *Anderson* and the dissent in *St. Mary's Honor Center* point out that there is language in the majority decision in *St. Mary's Honor Center* to support a finding that additional evidence of discrimination besides what we note above is required to prove intentional discrimination. *Anderson* finds that such language is dicta; however, other courts have found otherwise. *See Woods v. Friction Materials* (1994), 1st Cir., 30 F.3d 255, 260.

**9.** Specifically, the court stated in its conclusions of law:

The evidence in this case establishes by a standard of substantial evidence that the Commission was correct in finding:
 a. [Bauermeister] is a member of a protected class; and

 b. [Bauermeister] established he was otherwise qualified for the position sought.
The evidence does not, as a matter of law, establish by a preponderance that [Bauermeister] was "... (excluded) from equal opportunities because of (a) ... handicap...." I.C. 22–9–1–3.
(R. at 39).

**10.** The basic formula is four-pronged and requires the claimant to establish membership in a protected class, eligibility for the position, adverse action taken against him with regard to the position, and continued availability of the position to others of like qualifications. *Loyd*, 25 F.3d at 523. "The specifics, however, will inevitably vary and are dependent upon the type and circumstances of employment action under attack." *Id.*

Bauermeister was "minimally qualified for the position by virtue of his education and experience." *Id.* This satisfies the "modest initial burden" which the Supreme Court places on claimants in disparate treatment actions and does not remove from the claimant the ultimate burden of "persuading the trier of fact that the reason was pretextual and that intentional discrimination had in fact occurred."[11] *Barth v. Gelb* (1993), D.C.Cir., 2 F.3d 1180, 1185 *cert. denied,* — U.S. ——, 114 S.Ct. 1538, 128 L.Ed.2d 190 (citing *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94.). In addition, Judge Swygert, writing for the Seventh Circuit, found that the policies behind the *McDonnell Douglas* framework are best served "by limiting the prima facie showing of 'qualification' to relative objective qualifications." *Jayasinghe v. Bethlehem Steel* (1985), 7th Cir., 760 F.2d 132, 135 (footnote omitted); *see also Jayasinghe,* 760 F.2d at 134–35 (discussion of policies which support requirement of prima facie by claimant in cases of disparate treatment analyzed under *McDonnell Douglas* framework).

■ Once Bauermeister presented his prima facie case, the burden shifts to SIGECO, which must then produce evidence of an articulable, non-discriminatory reason for the challenged action.

Consolidating the information in SIGECO's answer to the complaint, New and Glancey's 1990 testimonies, and SIGECO's appellate brief, SIGECO articulates several non-discriminatory reasons why New, the plant manager who was the ultimate decision maker in this hiring situation, rejected Bauermeister:

1. Bauermeister was not the most qualified candidate; and

2. Glancey, who had supervised Bauermeister at Culley Lab, gave Bauermeister a negative recommendation. According to Glancey's recommendation:

a. Bauermeister would not analyze problems correctly;

b. Bauermeister was unable to troubleshoot with his equipment;

c. Bauermeister did not take initiative. He did not accomplish tasks in a timely fashion and needed someone to tell him to do something;

d. Bauermeister did not have a safety conscious attitude. He did not follow safety procedures in handling chemicals, would not use his protective equipment, and was responsible for an acid spill that occurred while he was on duty. Bauermeister's safety record showed four accidents.

We note that SIGECO's non-discriminatory reasons changed somewhat from the time it filed its answer to Bauermeister's complaint to the writing of its appellate brief nearly nine years later.[12] Neither controlling legis-

---

11. SIGECO stated in its response to requests for production that it did not have a job announcement or notice for the Apprentice Electrician position; however, SIGECO did produce a "Sample Job Vacancy Notice," (Comm'n R. at 382), which stated that "[t]he duties of power plant electrician include trouble-shooting, repairing and maintaining of power plant electrical equipment and other duties as required." (Comm'n R. at 248).

12. In its answer to Bauermeister's complaint, SIGECO asserted that:

2. [SIGECO] denied that [Bauermeister] was qualified for the available job opening of electrical maintenance as Dennis Glancey, Manager of Operations at the Brown Lab, would not recommend him for the electrical maintenance opening. Millard New, plant manager by the A.B. Brown Generating Lab, requested Glancey to evaluate [Bauermeister] as he knew complainant worked for Glancey at Culley Lab.

New made the final decision as to the selection of the individual qualified for the job of electrical maintenance.

3. Supervisor, Dennis Glancey, would not recommend [Bauermeister] for the job of electrical maintenance due to the following reasons:

(a) When [Bauermeister] worked for Dennis Glancey, in the Culley Lab, [Bauermeister] would not analyze problems correctly.

(b) [Bauermeister] showed a lack of concern in contributing to the department by not taking initiative to accomplish tasks in a timely fashion.

(c) [Bauermeister] did not demonstrate a safety conscious attitude, as he would not follow, in a number of instances, the proper safety procedures in handling chemicals and he would not use his protective equipment. [Bauermeister]'s safety record shows four accidents, which one being a lost-time accident [sic].

(Comm'n R. at 7).

lation nor precedent offer us guidance as to whether an employer can modify, alter, or refine its non-discriminatory reasons for a challenged action over the course of a proceeding; however, we shall consider all of SIGECO's reasons for its action.

Having articulated legitimate and nondiscriminatory reasons for Bauermeister being denied the position he sought, the burden shifts to Bauermeister to establish that the proffered reasons are merely a pretext for a discriminatory reason to permit the factfinder to infer the ultimate fact of intentional discrimination.

■ A claimant may show pretext by direct evidence that discrimination more likely motivated the employer or circumstantial evidence that the employer's proffered explanation was not the true reason and discrimination was. *St. Mary's Honor Center,* — U.S. at ——, 113 S.Ct. at 2749. "Untruthfulness may be demonstrated through evidence showing: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually ... motivate the adverse employment action or (3) that they were insufficient to motivate the adverse employment action." *Arnett v. Tuthill Corp.* (1994), N.D.Ind., 849 F.Supp. 654, 664 (quoting *Weihaupt v. American Medical Ass'n* (1989), 7th Cir., 874 F.2d 419, 428 *reh'g denied* (quoting *Kier v. Commercial Union Ins.* (1987), 7th Cir., 808 F.2d 1254, 1259,

*cert. denied,* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 528)).

The record before us does not support SIGECO's proffered reason that Bauermeister was not the most qualified applicant for the position. In 1985, SIGECO hired five Apprentice Electricians. One of the successful applicants, Robert Sager, had yet to graduate from ITT with an associates degree in electrical engineering and had no relevant work experience. Two of the successful applicants, Steve McCallister and Mark Pendley, had associate degrees in electronics; however, McCallister had worked less than a year as a maintenance person with computers and before that as a warehouse worker, and Pendley had spent the last 13 years as a salesman. Each of these applicants was hired after Bauermeister was interviewed on July 22, 1985. *See* (Comm'n R. at 318). Bauermeister had worked at SIGECO for eight years when he applied for the Apprentice Electrician position. He had an associate degree in electronics from Vincennes University and additional training from Purdue University. The "Job Vacancy Notice" submitted by SIGECO required that applicants have "prior experience and/or training in electrical maintenance[,] associate degree in electronics[, and] physically able to perform heavy work." *Id.* at 483. Based solely on objective criteria, Bauermeister was superior to these three candidates and Bauer-

In New's 1990 testimony, he stated that Bauermeister "was not the best candidate for his past—I rejected him for his past work record," (Comm'n R. at 962). New confirmed that Glancey spoke of Bauermeister's problems with logical thinking, and added that Glancey emphasized Bauermeister's problems with trouble-shooting his equipment which was safety related.

In Glancey's 1990 testimony, he stated that he told New that he couldn't recommend Bauermeister because of Bauermeister's inability to analyze problems which was related to safety. Upon further questioning, Glancey added that Bauermeister had problems in other areas

his initiative in doing the job and going, you know past just waiting on somebody to tell him to do something and some of these safety items with valving in the demineralizer. And [New] asked me some specifics, and I mentioned about this one acid spill that we'd had out there.

(Comm'n R. at 1938–39).

In its Appellate Brief, SIGECO states that its non-discriminatory reasons that Bauermeister

was rejected by New, who "held ultimate authority to transfer Bauermeister," determined that Bauermeister was unable to "fully think through his problems and [unable] to logically go through the process of troubleshooting." Appellee's Brief at 18–19. New's determination was based on a negative recommendation which Bauermeister's former supervisor, Glancey, gave to New concerning Bauermeister's work habits. According to its Brief, SIGECO contends that Glancey testified that

Bauermeister's poor work habits cover[ed] three different areas:
1. His inability to analyze problems correctly;
2. His lack of initiative in doing the job, i.e. having to have someone to tell him to do something; and
3. Safety concerns with valving in the demineralizer and an acid spill that occurred while Bauermeister was on duty.

*Id.* at 19. In its brief SIGECO also states that it is uncontradicted that Bauermeister was not the "most qualified candidate." *Id.*

meister has thus cast doubt on this rationale for his rejection.[13]

Bauermeister argues that the contradictions between SIGECO's proffered reasons in 1990 and the documentary evidence at the time of the 1985 decision logically and reasonably lead to a conclusion that SIGECO's stated reasons were pretextual.

First, although SIGECO's answer to the complaint stated its rejection of Bauermeister was based on New's interview of him, *see Id.* at 8, New did not testify, nor do his notes made contemporaneously with the interview indicate that the result of the interview was unfavorable.[14] *See Id.* at 977–80.

According to New's notes, Glancey thought that Bauermeister's "transfer as an EM should be questioned," *Id.* at 273; however, in SIGECO's answer, and the testimonies of New and Glancey, Glancey's comments are portrayed as definitely not recommending Bauermeister for an Apprentice Electrician position.[15] As the Commission's hearing offi-cer pointed out in his finding, there is a difference between absolutely not recommending someone for transfer and questioning the transfer. Neither New in his testimony, nor SIGECO in any submitted material, offers an explanation for this apparent inconsistency. Because New's notes were written contemporaneously with his conversations with Bauermeister and Glancey, a factfinder could reasonably infer that Glancey merely questioned the advisability of transferring Bauermeister, and did not flatly withhold his recommendation as New and SIGECO later claimed.

New's 1985 notes pertaining to his conversation with Glancey are inconsistent with SIGECO's proffered reasons for its rejection in its answer and New's and Glancey's testimonies. The notes mention only Bauermeister's mistakes in valving in and out of equipment;[16] the answer and testimonies emphasized Bauermeister's inability to analyze problems, lack of initiative and unsafe work

---

13. We emphasize that SIGECO's burden was one of production, not proof; however, in this situation we are compelled by the evidence to find that Bauermeister has cast doubt on SIGECO's rationale because we have before us the objective criteria for the position and New's statement that "I had a lot of people interviewing for this job and I had a lot of top candidates interviewing for this job." (Comm'n R. at 959). If, like in *Murphy v. Marsh* (1990), 53 F.E.P. Cases 151, 1990 WL 80994, SIGECO had come forward with evidence with respect to the superior qualifications of the top candidates compared those of Bauermeister, our finding may have been different.

 In addition, according to the agreement between SIGECO and the union representing electrical workers at SIGECO, "[w]hen a vacancy occurs . . . , [SIGECO] will consider seniority and ability, and ability being sufficient, seniority shall prevail." (Comm'n R. at 426). In this case, Bauermeister did not benefit from his seniority at SIGECO. New testified that he did not obtain recommendations for any of the successful applicants who were "new-hires" for SIGECO, that is employees who had not been employed at SIGECO before this time. *Id.* at 983. In addition to interviews with the personnel department and with New that were required of the successful applicants, Bauermeister also needed a favorable recommendation from a former supervisor. Instead of benefiting from his seniority at SIGECO, Bauermeister was somewhat disadvantaged.

14. The text of the notes made contemporaneously with Bauermeister's interview are as follows:

 Jim Bauermeister 7/22/85 EM [Electrical Maintenance]
 1. He think his lost time record is about 1 lost day in last 8 years due to accident.
 2. Lost about 7 days total in last 8 years due to sickness.
 3. Feels that he would be able to perform any normal duties of an EM after he *adapts.* Can climb ladder.
 4. Completed associate decree [sic] from Vincennes in 1970 additional 3 years electronic education at Purdue.
 5. May 1980, graduated from ISUE—BS—marketing manager _____ DLG [Glancey].
 Made a lot of mistakes in valving in/out equipment—can't make same mistakes as AE therefore his transfer as an EM should be questioned.
 (Comm'n R. at 273). New stated that the text under the line was written after his meeting with Glancey.

15. New testified that Glancey asked him what job Bauermeister was looking for. When New replied, electrical maintenance, Glancey said: "Boy, . . . I couldn't recommend that." (Comm'n R. at 956).

16. "Valving in and out" pertains to the opening and closing of valves, in this instance the valve controlling a demineralizer in a line pit. (Comm'n R. at 1034).

habits. When asked to describe Bauermeister's inability to analyze problems, Glancey testified:

A. ... Mr. Bauermeister was in charge of the demineralizer operation. During one day we have a major spill and had damaged the lining, we gotten some acid into this lining in the sump area. The acid, when it reacted with water, became hot and we had a problem with the materials.

Q. Was Mr. Bauermeister responsible for that?

A. Yes.

&ast; &ast; &ast; &ast; &ast; &ast;

Q. And that has to do with the analysis of the problem?

A. Well, not necessarily the analysis of that, of a problem, no. In that case, I believe Mr. Bauermeister just wasn't paying enough attention to detail and what he should have been doing at the time to make sure that the valve was closed before he left the area.

Q. He just didn't close a valve?

A. That's correct.

Q. Wouldn't that be fairly serious?

A. It caused a serious spill, yes. Luckily it went into the sump and nobody was hurt, but it damaged the lining material that we put in that area....

Q. And you didn't write up Mr. Bauermeister for a problem like that?

A. Well, I couldn't directly attribute it to him, I guess. I knew he was working in that area, I questioned him about it, his knowledge was, "hey, I left the area in a manner that was okay." I guess I have nothing directly toward him. No, I didn't. I didn't give him a reprimand concerning that.

(Comm'n R. at 1029–30; 1034–35). This testimony reveals one valving incident which Glancey attributed to Bauermeister as opposed to "a lot of mistakes" as New's notes indicate. *See also Id.* at 1332–34 (Bauermeister's testimony of the valving incident). Further, valving in and out of equipment pertains to manipulating machinery, a mechanical function, and not a function requir-

ing analysis or problem solving skills. Thus, when directly asked about Bauermeister's problem solving skills, Glancey testified about an episode involving a lack of attention which could only demonstrate Bauermeister's unsafe work habits. Further, if Glancey told New about Bauermeister's inability to analyze problems, lack of initiative and trouble shooting problem, New failed to memorialize these problems. Instead, he chose to take note of Bauermeister's mechanical mishaps which resulted from his lack of attention.

However, although a lack of attention or a poor safety record can be serious non-discriminatory reasons for rejecting Bauermeister, none of them are reflected in Bauermeister's personnel file. Glancey, who was concerned about Bauermeister's failure to analyze problems, lack of initiative, many mistakes, as well as his unsafe work habits, failed to enter any of these concerns in Bauermeister's file by way of warning, reprimand, or suspension. In fact, none of Bauermeister's supervisors entered these problems into Bauermeister's personnel file.

Also, the documentation of Bauermeister's "deficiencies" which are contained in his personnel file do not match Glancey's testimony regarding the file. Glancey testified that Bauermeister lacked a safety conscious attitude which he illustrated by revealing that Bauermeister's safety record which "showed four accidents, with one being a lost-time accident." *Id.* at 7. However, Bauermeister's personnel file sent by SIGECO to the Commission contains a list of three employment related injuries. *Id.* at 247, 250–73. The injuries occurred in 1978, 1981, and 1984, the only report for the 1981 injury was signed by Glancey. Glancey testified that he was a plant chemist at Cully Lab from 1980 to 1982. *Id.* at 1027. Thus, Glancey has no direct means, and little apparent reason, after 1982 of knowing about Bauermeister's safety record.

In addition, Woodall testified that there was nothing in Bauermeister's personnel file which indicated he had a poor safety record. *Id.* at 1011. And Penfield, director of industrial relations, testified that as far as the personnel department was concerned there was no information in Bauermeister's file

that showed that Bauermeister was not able to do the job of apprentice electrician. *Id.* at 1405.

As previously stated, a claimant may prevail by establishing a prima facie case and by showing that the employer's proffered non-discriminatory reasons for his discharge are factually false. *Anderson*, 13 F.3d at 1124. "[N]o additional proof of discrimination is *required.*" *St. Mary's Honor Center*, — U.S. at —, 113 S.Ct. at 2749 (emphasis in original). We are satisfied that there is sufficient, substantial evidence to allow reasonable minds to conclude that SIGECO's proffered non-discriminatory explanations were pretextual.

However, in addition, the record also reveals substantial evidence that New and others at SIGECO were predisposed to reject Bauermeister on the basis of his disability.

The posting for the job indicated that the applicant had to be "physically able to perform heavy work." (Comm'n R. at 483). New was well aware of the job's demands, as he had performed it himself.

A. So it's those type of things, but, that would—if you had three hands, you'd be better off than two hands. Let me put it that way. So any impairment that you might have would lower your total abilities to do that job, but I, I'm not gonna, I wouldn't sit here and say it would make him unable to do the job.

\* \* \* \* \* \*

Q. Mr. New what—at that time what were the, generally speaking, the duties of electricians that would be, perhaps taxing on a person who only had one hand?

A. Oh, I think those that are more involved with mechanical aspects of it, getting your equipment to and from the site. Sometimes it's big; sometimes cumbersome. Doing the rigging, for example, they got to rig to move their mechanical motors.... That's a statement that I have never seen someone with a, one arm or one hand or with a hook in the other hand do that or perform that. So that's just a, if you ask me what I thought would be the difficulties.... so, it's the type of the more the heavier part of it that I would

have some concern with. I would say that I would think he could take the proper precautions. I would think that when it comes down to manipulating small things, and again, *I've never seen him do this or not do this, so I'm not sure whether that's accurate, but I would think he would have some difficulties in doing that.*

Q. Anything else? ...

A. No. If it was, if it was an electrical shock problem he could, I'm sure he could insulate it somehow. I would think he could. So the shock part of that should not be of any concern to me. *It's really the, the dexterity of it as, as a set of fingers, if that is or is not so, and his ability to manipulate heavy loads would be my main concern.*

Q. What about climbing?

A. I don't know how his hook works. I'm not qualified to say that. You can ask me would I, would I think he would have to take some good precautions? Yeah, I would think he would have to.

*Id.* at 963–64; 970–73 (emphasis added).

Despite his concerns and uncertainty about hiring a man with a prosthesis instead of a right hand, New's notes, his testimony, and Bauermeister's testimony about the interview do not reveal that New seriously addressed his concerns apart from some discussion about Bauermeister's ability to climb ladders. *Id.* at 1320–22.

We note that Glancey testified that Bauermeister had no trouble handling small parts. "[T]hat guy was able to tear stuff [machinery] down and put it back together that would cause a guy even with two normal hands problems. In fact, it did me." *Id.* at 1041. Further, Glancey testified that he told New that Bauermeister could do "everything I asked him to do, even fine detailed work." *Id.* at 1042. Although physical dexterity was one of New's main concerns in 1990 when he testified, he did not elicit, did not remember eliciting, or did not take notes about this information from Glancey in the 1985 meeting.

In his interview with Bauermeister and his meeting with Glancey, New could have acquired sufficient information to determine

whether Bauermeister was physically able to do the tasks of an electrician, which according to his testimony he was concerned about, yet he apparently did not.[17] New preferred to speculate about Bauermeister's capabilities rather than ask Bauermeister directly or express his concerns to Glancey. "Unlike a person's race, an employer may legitimately take a handicap into consideration in determining whether an applicant or employee is qualified for a particular position." *Barth*, 2 F.3d at 1186. New's conjecture about how someone with a prosthesis would perform as an electrician deprived Bauermeister of proving, demonstrating, or even asserting his distinct and unique personal abilities. This is discrimination based on a disability which our laws have been set out to prohibit.

Finally, at the conclusion of New's testimony he was asked, what counsel characterized as the "ultimate question:"

Q. If Mr. Glancey had favorably commented upon Mr. Bauermeister, all things being equal in the interview, would you have hired Mr. Bauermeister?

A. If, if his—by "favorable" you mean he was highly recommended? ... I think I would have.

(Comm'n R. at 989–990). Given the facts in Bauermeister's favor, that he had more work related experience than two of the successful candidates, more education than another of the successful candidates, and had worked for SIGECO for eight years, the fact that a "favorable" recommendation, in a situation where none of the other candidates had recommendations, did not elicit a unequivocal positive response from New reasonably supports the inference that Bauermeister's rejection was not based on nondiscriminatory reasons.

New also testified:

I was aware that he had that hand, but I was determined that they was not going—again, I figured the company had already made up their mind that this man was qualified or they wouldn't have sent him.

*Id.* at 975.[18] SIGECO asserted in its Appellate Brief that New "held the ultimate authority to transfer Bauermeister." Appellee's Brief at 18; *see also Id.* at 1402 (Penfield's testimony that "the ultimate decision came from Millard New."). And in a 1990 interrogatory, when asked "who had responsibility of making the decision to grant or deny [Bauermeister]'s request for transfer ... to Electrical Maintenance Technician ... between July 1, 1985 and September 4, 1985," SIGECO answered: "Dennis Glancey, Millard New and Rod Penfield." *Id.* at 399. When asked who was responsible for making the decision to hire Apprentice Electricians, SIGECO responded: an employment supervisor, the director of industrial relations, and the plant manager. *Id.* at 406. It could be reasonably inferred that although New may have had the final decision whether Bauermeister was transferred, others in the company including upper management bore some of the "responsibility of making the decision to grant or deny [Bauermeister]'s request for transfer from Laboratory Technician to Electrical Maintenance Technician." *Id.* at 399. Thus, testimony of SIGECO's management is relevant in determining whether day-to-day SIGECO policies and practices created an

17. When asked about Bauermeister's interview, New stated that he asked "about routine things ... absenteeism, ... safety and I asked about his education background." (Comm'n R. at 955). When asked specifically whether he discussed Bauermeister's disability, New testified: "I can't remember whether it did or it didn't, so I just can't remember." *Id.*

18. Curiously, Henry Woodall, supervisor of employment, who conducted Bauermeister's screening interview stated that it was his duty to make sure applicants, including Bauermeister, were minimally qualified for the position they sought. In the case of an apprentice electrician, the applicant had to have an associates degree in electronics. Woodall testified that he did not know the duties of an electrician or whether Bauermeister could physically perform the job. Woodall never asked Bauermeister questions about his physical capacities or about his prothesis. He assumed that specific questions about Bauermeister's ability to perform the tasks of an electrician would be pursued in the on-site interview. (Comm'n R. at 1019); *see also id.* at 1401–02. (Penfield's, director of industry relations, testimony regarding screening interview procedures). Although New had the impression that the personnel department had "made up [the company's] mind" when it arranged for Bauermeister to interview with him, the personnel department viewed its responsibility as little more than checking minimal qualification for a position.

atmosphere in which an employment decision which was discriminatory would have been tolerated.

The testimony of George Ray Hust supports the inference that discriminatory employment decisions were not outside the policies or practices of SIGECO. Hust initially joined SIGECO as an electrician in the electrical substation department, transferred to construction maintenance foreman, and in 1965 became manager of labor relations. In this position he handled grievances and complaints filed by disgruntled employees. Given this job description, a factfinder could reasonably infer that Hust had the opportunity to become particularly sensitive to SIGECO's policies concerning issues like discrimination.

Attached to his complaint, Bauermeister submitted two letters to support his contention of intentional discrimination. The letters were from men who attended a grievance meeting as union representatives on October 8, 1985. David E. McNeely, who also testified via deposition, wrote that Hust said that he did not think a person with one arm could fill the Apprentice Electrician position because the position required the employee to climb ladders and "he didn't think a person with a mechanical arm could, could do that." *Id.* at 907. The second letter was from Darrel Smith, a janitor at Culley Lab. Smith's letter stated that Hust said that he would never admit that the arm was the reason "but that was the way he felt about it." *Id.* at 96.

Although Hust denied Smith's statements in his deposition, he stated that a person with only one arm would have difficulty performing an electrician's job safely and efficiently. He commented:

It's true that you may not climb for as long as a year sometime and then you may spend four or five months climbing, plus the proximity to hot equipment it's, you got a safety problem there plus a problem with manual dexterity behind hot panels. You could take a section of a city off by some inability to move or to adjust something or to—

Q: So is having both hands, is that, would that be a prerequisite of your, of the job as electrician?

A: Yes. My experience and the way we use electricians at SIGECO that's correct. [*Id.* at 923.]

\* \* \* \* \* \*

[Bauermeister] ultimately could do [the job], but he wouldn't be in my judgment proficient enough and get good enough to justify putting him in the job. [*Id.* at 936.]

\* \* \* \* \* \*

I am concerned that ... that inevitably he would get injured because of his inability, his lack of both hands, not only from a safety standpoint falling but getting into other equipment.

*Id.* at 939. Concluding his remarks, Hust said:

All I am saying is that as a supervisor [of electricians] I wouldn't put a guy with one hand on something that's very critical or something he could get into trouble with....

Q. With regard to apprentices you don't necessarily throw apprentices on everything out there either do you, right away?

A: oh, heck no. But *we don't hire apprentices with an arm off there, you know. You don't do that. And we may eventually be made to, but it's still going to cause one hell of a lot of problems in production and personnel problems.*

*Id.* at 940–43 (emphasis added). A factfinder could reasonably infer that SIGECO's management, as represented by Hust, manager of labor relations, tolerated an atmosphere in which a decision by New to reject Bauermeister for transfer based solely on his disability would have been permitted.[19]

---

19. We also note the testimony of James VanMeter, president of electric operators, who stated:

All I'm saying ... this is, all our electricians are in a common labor classification and ... [sometimes] have to go to the substation group and help ... I would personally have some concerns of being able to climb and work on steel structures and things like that.

(Comm'n R. at 1056). This testimony about VanMeter's "concerns of being able to climb" is consistent with Bauermeister's testimony regarding a conversation he had with VanMeter after a

The testimony of Hust is cumulative and supports the Commission's ultimate finding of pretext and intentional discrimination. Thus, we find that contrary to the trial court, the Commission's decision is supported by substantial evidence of probative value.

## III.

■ Bauermeister also contends that the trial court erred when it found that SIGECO did not receive a full and fair hearing by the Commission's hearing officer. However, SIGECO asserts the trial court was correct in finding that the Commission did not have a reasonably sound basis of evidentiary support for its finding of discrimination, but instead acted on its clearly-expressed bias against SIGECO.

■ Due process requirements in the context of administrative proceedings are clear in requiring that a hearing be conducted before an impartial body. *New Trend Beauty School v. Indiana State Bd. of Beauty Culturist Examiners* (1988), Ind.App., 518 N.E.2d 1101, 1104. A trial court (or an administrative hearing officer) has a duty to remain impartial and refrain from making unnecessary comments or remarks. *Taylor v. State* (1992), Ind.App., 602 N.E.2d 1056, 1059 *trans. denied.* The judge (or hearing officer) should be an impartial person whose conduct and remarks do not give the impression of partiality. *Id.* However, not all untoward remarks by a judge or a hearing officer, constitute reversible error. *Id.; Parker v. State* (1991), Ind.App., 567 N.E.2d 105, 112, *trans. denied.* The remarks must harm the complaining party or interfere with the right to a fair trial. *Id.* Reversible error may also be established by demonstrating "by a valid and complete record that the alleged bias or prejudice stems from an extra-judicial source and result in an opinion on the merits on some basis other than what was learned through participation in the case." *Matter of Sekerez* (1984), Ind., 458 N.E.2d 229, 233 *cert. denied* 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116.

In the present case, the trial court found that "[t]he transcript is replete with instances where the Hearing Officer evidenced bias or prejudice against the position of SIGECO." (R. at 30). However, neither the trial court in its decision nor SIGECO in its Brief offers any evidence that the bias or prejudice stems from an extra-judicial source and resulted in an opinion on the merits on some basis other than what was learned through participation in the case. SIGECO does not offer any instance or manner in which it was deprived of a fair hearing. Although we do not condone the untoward remarks made by a hearing officer in an administrative hearing, and indeed recognize that in some instances the remarks might constitute error, because we find, in Issue II above, that the evidence presented by the parties supports the Commission's finding of pretext and intentional discrimination, we will not reverse the Commission decision.

The trial court erred in vacating the Commission's order. Its decision is reversed with instruction to reinstate the Commission's order.

DARDEN, J. concurs in result.

KIRSCH, J. concurs in part and dissents in part with separate opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

I fully concur with the majority's holding that there is sufficient evidence of probative value to support the commission's determination of discrimination in this matter. I respectfully dissent, however, from their conclusion that the prejudice of the hearing officer did not deny a fair hearing to SIGECO.

The trial court found that "the transcript of the hearing is replete with instances where the Hearing Officer evidenced bias or prejudice against the position of SIGECO," that "a fair hearing was not conducted," and that "the record of this matter leads inescapably

1978 rejection for transfer to an Apprentice Electrician position. At that time, VanMeter was director of power production and involved with hiring. According to Bauermeister, VanMeter said that everyone he had talked to agreed with him that someone without a right hand could not be an electrician. *Id.* at 102, 1126.

to the conclusion that it did not receive such a hearing."

In its findings, the trial court set forth repeated and specific instances of prejudice on the part of the hearing officer. These instances include the following:

First, prior to the hearing, counsel for all parties stipulated to the introduction of deposition testimony. The stipulation was approved by the hearing officer in his final pre-trial order. In a footnote to his findings, the hearing officer makes the following comment:

"Ostensibly this method of securing testimony, requested by SIGECO's counsel . . . was utilized to avoid bringing these witnesses to Indianapolis for the hearing. . . . Nevertheless, this method was a good trial tactic of SIGECO's counselor, as it allowed his witnesses to present their testimony, which is of overwhelming importance to this matter, in the atmosphere of his law firm rather than the more stark, neutral ground of a hearing room under more formal conditions."

Second, the hearing officer noted that the claimant had received an affirmative action letter from the chief executive officer of the respondent. This letter was sent by SIGECO's chief executive officer to all employees in compliance with federal law. Notwithstanding such fact, the hearing officer stated:

"For the president of SIGECO to have sent a letter to each employee which included a statement that the employees would not be denied a promotion because of a physical handicap is unusual and unexpected and makes one wonder what would have motivated such an epistle."

Third, in his deposition testimony, Millard New, one of SIGECO's supervisors, responded to a question of whether he knew the claimant prior to the interview saying:

"Well, I knew Jim. I was stationed at the Culley Station for about a year and a half, so I knew of him, although I didn't know him professionally that much."

From this answer, the hearing officer drew the following inference:

"It is most curious that New would select the words, 'I knew of him. . . . [T]o say 'I knew of him,' . . . can reasonably lead to the inference that New had formed a personal opinion about, or was aware of the reputation of, or opinions of others, about Bauermeister and the perceived limitations of his hook prior to New's interviewing him."

Fourth, the hearing officer noted that New testified in his deposition that he could not remember whether the subject of Bauermeister's hook came up during his interview and quoted item 3 of New's interview notes which provided: "Feels that he would be able to perform any normal duties of an EM after he *adapts*. Can climb ladders." From these notes, the hearing officer concludes that New used the word "*adapts*" because he was considering the petitioner's hook. He states, "It means adapting with his hook to the procedures rather than merely learning the procedures." Notwithstanding the fact that New's note provides to the contrary, the hearing officer stated, "New thought it would be difficult if not impossible for one with a hook to climb ladders while performing the duties of an electrician." Finally, he concludes, "Item 3 in New's interview notes, in both of its subparts, has significance only because it addresses the prejudice of New that a man with a hook should not be an electrician. . . . Bauermeister's hook was considered by New in his interview of Bauermeister to the detriment and later rejection of Bauermeister." From these comments, the trial court concluded, "It is difficult to understand how these conclusions can be obtained from this one quotation from a deposition, absent prejudicially reading more into it than is warranted from the language."

Fifth, the hearing officer set forth the following portion of New's deposition:

"Q. What did Dennis tell you, Dennis Glancey?

A. First question he says, he said, well I said, 'Well, what about his work habits?' He said, 'Well, he's, he's made some mistakes like going out and troubleshooting his equipment,' as I recall. And he said 'By the way, what job are you looking for him for?'

I said, 'Well, electrical maintenance.'

He said, 'Boy,'? He said, 'I couldn't recommend that.' "

From the fact that the court reporter inserted quotation marks about Glancey's statements, the hearing officer concluded: "However, New surprisingly remembered his conversations with Glancey down to the exact words each used.... New has either a most unusual (and perhaps abnormal) memory and recall or his veracity is seriously in doubt." The trial court noted that the deposition did not indicate, other than by the court reporter's quotation marks, that New intended his recollection to be a verbatim statement and concluded, "the Hearing Officer has taken court reporter notation and used it to attack the witness' credibility."

Sixth, the hearing officer stated:

"New did not agree with Industrial Relations that a man with a hook could perform the job or was qualified to be an electrician. *There was absolutely no doubt in New's mind* that any man with a hook could not perform the job as well as a man with two (2) hands. Therefore, it *forever* would be impossible for a man with a hook to be as well qualified as other applicants with two (2) hands and unthinkable that a man with a hook could ever be the most qualified for an AE position." (Emphasis added).

The trial court found that from the evidence in the case and having read the deposition of Mr. New, that it could not "comprehend how anyone could say what doubts were or were not in Mr. New's mind or that something was forever preempted."

Seventh, the trial court commented on the choice of language used by the hearing officer, stating:

"There are other examples of the type of language above demonstrated within the Findings of the Hearing Officer. Others, such as the 'scornful attitude' of Van Meter when discussing his opinions on hiring handicapped. How one can detect a scornful attitude in the fact situation described

in this deposition, without the witness in front of you, is difficult to understand."

The court continued stating that the "most illustrative example ... of bias in the Hearing Officer is the language used by the hearing officer in regard to the initial determination that Petitioner was qualified." In response to the question of whether Bauermeister was sent out for an interview, Mr. Woodall, the Supervisor in Personnel stated: "He was *allowed* an interview at the A.B. Brown plant." The hearing officer made the following comment: "What an unusual choice of words, 'allowed', in response to the question posed. How *regal;* how *condescending.*" (Emphasis added).

Based on the foregoing findings, the trial court concluded that although there was "some evidence ... that in fact there was discrimination, the fact remains that the Respondent was also entitled to a full and fair hearing of its case. The record of this matter leads inescapably to the conclusion that it did not receive such a hearing."

The ultimate factual determination in this case was whether SIGECO's reasons for its employment decision were pretextual. This determination, which rests upon an assessment of the credibility of all parties, was undermined by the hearing officer's repeated demonstrations of prejudice toward the employer. The trial court was correct in its determination that SIGECO was denied a fair hearing. I would affirm the trial court and remand for a new hearing.[1]

---

1. In so stating, I am not unmindful of the fact that this case is already nearly a decade old. James Bauermeister's complaint was filed on October 1, 1985. The Commission did not enter its order until 1991. Such delays are unconscionable and operate to deprive all parties of the rights of due process and fair hearing.